GEORGE E. GRONEMEYER,

*vs.*

HUNTER MANUFACTURING CORPORATION, a corporation of the State of Delaware.

*New Castle, July 6, 1954.*

*Joseph A. L. Errigo, John M. Bader, Edmund A. Traccarella,* Wilmington, for plaintiff.

*William Marvel,* of Morford, Bennethum & Marvel, Wilmington, *John K. Watson,* of Dorr, Hand & Dawson, New York City, for defendant.

SEITZ, Chancellor: This is an action to enjoin the defendant corporation from using certain drawings and patterns or copies thereof, and for an accounting of profits earned by defendant.

Plaintiff, George E. Gronemeyer, is a mechanical engineer who for some years has specialized in industrial installation. He devised

a system of reflective metal sheets arranged in layers with air spacings between which he called "Mirror Insulation". The basic idea was subsequently incorporated in a patent which was granted him.

The plaintiff by testing and experimentation came to develop a practical and economical feasible basis for the commercial use of the product. In the course of this development plaintiff prepared or caused to be prepared a large number of patterns and drawings which showed how to make all the various types of insulating units for different sizes and shapes of pipes and for various temperatures.

Having obtained some financial backing, plaintiff organized a corporation known as the Gronemeyer Corporation which commenced the production of Mirror Insulation on a fairly large scale. Gronemeyer Corporation was active for approximately two years and furnished insulation for several large power plants. The sales for this period amounted to $350,000.

For reasons not here important the Gronemeyer Corporation encountered financial difficulties which required it to discontinue operations. About this time, Charles E. Hunter, president of the defendant corporation, became interested in Mirror Insulation. As a result negotiations were entered into which culminated in the contemporaneous execution on February 20, 1952 of four written agreements. One constituted a sale of the assets of Gronemeyer Corporation to defendant. The second was an employment contract between Gronemeyer and defendant. The third was an agreement to sell and assign the patent. The fourth was the so-called pattern agreement.

Under the agreement of sale between Gronemeyer Corporation and defendant, plaintiff provided for the assignment and sale to defendant of all the tools, machinery, stock in process and materials and all of the right, title, and interest of Gronemeyer Corporation, "if any", in the patterns, drawings, copyrights, trade-names and trademarks set forth in the attached schedule. For this defendant paid $34,636.54.

Under the employment agreement with defendant the plaintiff agreed to devote his entire time and engineering abilities to the fur-

therance of defendant's business. For this service plaintiff was to receive $1,050 per month, together with a percentage of the net profits of the proposed insulation division. Plaintiff also agreed not to engage in a similar activity for a period of two years following the termination of the agreement. The agreement provided for a termination by either party on 90 days written notice.

Under the agreement selling the patent the plaintiff agreed to transfer to defendant all inventions and patents relating, inter alia, to Mirror Insulation. For this agreement defendant paid plaintiff $5,000.

Finally, we come to the so-called pattern agreement which is the basis of this litigation. This agreement recites that plaintiff had become the sole owner of certain patterns, drawings, copyrights, tradenames and trade-marks usable in connection with the Mirror Insulation business. Under the agreement plaintiff turned over to defendant certain patterns and drawings in accordance with an itemized list to be used in connection with any Mirror Insulation business which Hunter might establish. The agreement provided that defendant would have the free use of the patterns and drawings until September 30, 1953 with extensions of time for certain delays. The crucial portion of the agreement dealing with defendant's option is paragraph 3 which reads as follows:

> "If Hunter shall on or before September 30, 1953 notify Gronemeyer in writing that it desires to retain title to any or all of said items in Schedule A, or shall fail on or before said date, to return said items to Gronemeyer as hereinafter provided, Hunter shall within ten days after the date of such notification or September 30, 1953, whichever is earlier, issue and deliver to Gronemeyer two thousand (2,000) fully-paid and non-assessable shares of the common stock of Hunter registered in the name of Gronemeyer, said number of shares to be increased or decreased proportionately in the event of an increase or reduction in said stock without receiving or paying consideration therefor. Hunter may, in its sole discretion, on or before September 30, 1953, return to Gronemeyer the patterns and drawings delivered by Gronemeyer to Hunter, in the same condition in which they were received by

Hunter, wear and tear excepted, and shall return to Gronemeyer the instruments of assignment of the copyrights, trade-names and trademarks listed in Schedule A, upon receipt of which by Gronemeyer this agreement shall terminate without liability by either party to the other."

The agreement also contains a provision giving defendant an extension of time in the event defendant is unable to establish an insulation business for certain designated reasons.

It is admitted that the patterns and drawings were returned to plaintiff on October 19, 1953, together with the copyrights, trade-mark and trade-names. It is also a fact that so far as the record is concerned the so-called missing drawings are not in defendant's possession. Indeed, the so-called missing drawings are not considered to be important to the issues involved.

Some issue is made as to whether the so-called "thickness tables", which disclose certain spacing information, were included in the pattern agreement. Because they are not explicitly mentioned, defendant argues that these tables must necessarily have been sold under the sale of assets agreement made by Gronemeyer Corporation. The difficulty with defendant's contention is that the sale of assets agreement also refers to specific assets and does not include these tables. They are an intimate part of the pattern agreement material and are fairly within its pragmatic scope. Moreover, the drawings, etc., admittedly have great value without the tables.

After some delay, plaintiff and a nucleus of his men, together with the machinery left at the Gronemeyer Corporation plant in Wilmington, moved to Bristol, Pennsylvania, where the Mirror Insulation Division of defendant was set up.

The first large order was one for which negotiations had been carried on by the Gronemeyer Corporation just prior to the sale. Other orders were obtained including repeat orders from old Gronemeyer customers. During the first fifteen months of operation the sales of the division amounted to about $443,000.

On August 28, 1953, about a year and a half after execution of the various agreements, plaintiff was notified in writing by defendant that his employment was to be terminated forthwith. At the same time plaintiff received a letter from defendant stating that the latter did not wish to exercise its option under the above quoted paragraph 3 of the pattern agreement. It also notified plaintiff that defendant intended to return to him on or prior to September 30, all patterns listed in the schedule, as well as the copyrights, trade-names and trade-marks. The return of the items actually did not take place until October 19. Plaintiff contends and defendant denies that during the ensuing period the defendant corporation caused copies of Gronemeyer's patterns to be made before returning them to him. Plaintiff objected to the making and retention of such copies. I need not resolve this issue because plaintiff's theory of relief would require defendant to desist from using patterns based on "know-how" disclosed by his drawings. So the issue as to whether copies were made of plaintiff's patterns is relatively unimportant.

On October 30, 1953, plaintiff wrote to several of defendant's customers telling them that Hunter had elected not to purchase the patterns and drawings and that Hunter's right to use them expired September 30. The letter also stated that injunction proceedings were being prepared.

Defendant's answer alleges that on October 19, 1953, they returned all existing patterns and at the same time furnished plaintiff with substantially modified, improved and revised copies of all drawings listed in the contract. The answer admits that the patterns and drawings referred to in the schedule are plaintiff's property and further alleges that the patterns and drawings and all copies thereof were returned to plaintiff by defendant on October 19, 1953.

Plaintiff's first contention is that the subject matter of the pattern agreement was the know-how exemplified by plaintiff's patterns and drawings. Plaintiff goes on to argue that the law recognizes a certain quasi-property right in inventions, discoveries, processes, and trade secrets, whether patentable or not. Based on these premises plaintiff

contends that equity will enjoin the use or disclosures of unpatented know-how by one who has wrongfully used or disclosed it.

On the other hand, defendant contends that it has performed one of its alternative undertakings under the pattern agreement and that plaintiff did not furnish defendant a trade secret under circumstances which would warrant interference by a Court of Chancery. Defendant argues further that even if the defendant has breached the agreement it cannot be made liable for the more onerous of alternative promises. Finally, defendant contends that if, as plaintiff contends, the defendant has not returned the drawings and patterns as required by the agreement, his remedy is at law for damages and not in equity.

Defendant also filed a counter-claim seeking to enjoin plaintiff from attempting to induce defendant's customers to breach their contracts with defendant or to refrain from contracting with defendant. This counter-claim is based on the letter sent by plaintiff to some of defendant's customers on October 30, 1953, and on the assumption that this court will decide that defendant has not interfered with plaintiff's rights and that it will be improper for plaintiff to make assertions as to his position once defendant's right has been established.

While the point was earlier in dispute and quite a bit of testimony was taken on the point, plaintiff now takes the position in his briefs that the defendant exercised its option to return the patterns, drawings, copyrights, trade-names and trade-marks. I shall proceed on this premise because that is plaintiff's position and defendant is not in a position to assert that it did not purport to exercise its option, and indeed does not.

Defendant admits that it has in its possession copies of drawings, as improved, which were made during the time the plaintiff was employed by defendant. Defendant also says that plaintiff was given copies of all these so-called improved drawings at the termination of the agreement. Defendant kept all patterns made by it but I find that it returned all of plaintiff's patterns.

The plaintiff contends that the option granted defendant under the pattern agreement was an option basically to purchase the know-how taught by the drawings and was not an option to purchase the mere physical drawings and patterns.

Defendant takes the position that the pattern agreement dealt only with the sale of the physicial drawings and patterns and not with the know-how incorporated therein. Defendant relies on the substantial consideration paid by defendant under the other agreements to show that the parties could not have intended that defendant's failure to purchase the drawings would require defendant, in effect, to forfeit its manufacturing set-up.

On the other hand, plaintiff points out that the number of shares to be delivered plaintiff in the event the drawings, etc., were retained, indicates that defendant was purchasing more than mere physical objects. It appeared that each share had a value of between two and three dollars. Plaintiff insists that he does not seek to prohibit defendant from making reflective insulation. Rather he says that he seeks to prevent defendant from using in its business the drawings, patterns or copies thereof in whole or in part, including any copies made from memory, or from inspection of the finished product.

Thus, the court is first required to decide whether the return of the physical objects was all that was contemplated in the event defendant elected not to purchase them or whether, as plaintiff contends, the sale was basically of the knowledge taught by the drawings with the implied condition that if they were not purchased the knowledge would not be used.

I am persuaded that the information disclosed by the patterns and drawings constituted know-how of a type which the law treats as a property right. *Coca-Cola Bottling Co. v. Coca-Cola Co., (D.C.) 269 F. 796.* I am also persuaded that this agreement was basically an agreement granting defendant an option to purchase the know-how disclosed by the drawings, etc., and that defendant was not entitled to use this information once it exercised its option to return the materials which disclosed the information. This is because of the confidential manner in which it was received. Compare *E. I.*

*duPont deNemours Powder Co. v. Masland,* 244 *U.S.* 100, 37 *S.Ct.* 575, 61 *L.Ed.* 1016; *Hoeltke v. C. M. Kemp Mfg. Co.,* (4 *Cir.*) 80 *F.2d* 912; *Allen-Gualley Co. v. Shellman Prod. Co., (D.C.)* 31 *F.2d* 293.

Under defendant's construction of the agreement, it could have immediately copied all the patterns and drawings and then returned the originals to plaintiff with complete impunity. Such a possibility would not seem reasonable here. My conclusion is buttressed by the substantial number of shares covered by the agreement even though matters other than the patterns and drawings were covered by the so-called pattern agreement. Also, the whole operation was a new one to defendant and presumably defendant desired to wait and see whether the operation was commercially feasible. Indeed the testimony of defendant's president shows this to be so.

Defendant says that many changes and improvements were made in the drawings after plaintiff went with defendant. This may well be true but my examination of the evidence persuades me that the basic know-how important to the commercial use of this type of insulation was contained in the patterns and drawings covered by the agreement. An impartial witness of great experience demonstrated this to be so.

Defendant also went to great lengths to try to show that the know-how reflected in the patterns and drawings was simple and easy to determine and therefore lacked novelty. Considering the manner in which the information was laboriously and privately collated by plaintiff and transferred to the patterns and drawings and with due consideration for the fact that the know-how admittedly could have been reproduced independently, the fact remains that it had substantial novelty and the required secrecy at that time and in that form. Its commercial appeal is some evidence to support my conclusion.

I conclude therefore that the information here involved met both the novelty and secrecy tests imposed by the authorities as a condition precedent to injunctive relief. We must also remember that the defendant freely executed this agreement and in effect agreed to pay for the know-how or refrain from using it after a fixed date.

I therefore conclude that when defendant elected to exercise its option to return the patterns, drawings, etc., it could no longer make use of the know-how which it retained by virtue of its possession of the drawings which reflected such knowledge. I say this realizing that some of the drawings in defendant's possession were so-called improvements or modifications of those covered by the pattern agreement. I further realize that this may make the question of relief a rather complicated one.

Defendant argues that it had alternatives under the agreement and that when it violated the agreement it could not be made liable for the more onerous of the alternative promises. The difficulty is that defendant actually elected one of two reasonable alternatives and its subsequent obligation was under that alternative. Compare 5 *Williston on Contracts, (Rev.Ed.)* § 1407; 1 *Restatement of Contracts,* § 344. Thus, defendant elected not to buy and plaintiff was entitled to have defendant abide by its election. Instead, defendant is using the know-how. Plaintiff is entitled to protection against this wrongful use and defendant is not in a position to say that plaintiff may only sue at law for damages. Plaintiff is entitled to equitable relief to protect its interest in the knowledge disclosed and to an accounting of profits accrued from its use after the election to return the material. Compare *Saco-Lowell v. Reynolds, (4 Cir.)* 141 *F.2d* 587.

Defendant argues that an injunction will put defendant out of the thermal insulation business. Plaintiff says that it does not seek such broad relief and I feel that he must necessarily make such a concession in view of the independent sale of the patent. The parties will therefore be heard on the scope of the injunction in order to protect plaintiff's interest and at the same time see that defendant is not unduly restricted. The parties will also be heard on the form and scope of the monetary relief.

In view of my conclusion on the complaint, and upon an independent consideration of the facts, I conclude that the counterclaim is without merit.

Order on notice.