DELAWARE CHEMICALS, INC., a corporation of the State
of Delaware,
Plaintiff,

*vs.*

REICHHOLD CHEMICALS, INC., a corporation of the State
of Delaware,
Defendant.

*New Castle, February 7, 1956.*

494

Howard L. Williams and Edmund Lyons, of Morris, James, Hitchens & Williams, Wilmington, for plaintiff.

James R. Morford, of Morford & Bennethum, Wilmington, Albert G. Goetz, of Goetz & Goetz, Detroit, Mich., and Harry C. Bierman, New York City, for defendant.

SEITZ, Chancellor: This is the decision on defendant's motion for summary judgment dismissing the entire complaint or, alternatively, a certain portion thereof.[1] It is also the decision on plaintiff's motion seeking judgment on its affirmative defense that defendant's counterclaims should be dismissed because of the statute of limitations.

1. The defendant's motion to dismiss was converted without objection into a motion for summary judgment.

Plaintiff's complaint contains two causes of action, one sounding in contract and the other in tort. The basic facts applicable to both causes of action are the same. While certain facts are in dispute I believe the facts material to the decisions on the pending motions are undisputed. Plaintiff and defendant are Delaware corporations. Plaintiff has been engaged in the manufacture and sale of a chemical known as pentaerythritol ("penta") since August, 1947. Defendant corporation used and now uses large quantities of penta in the production of chemicals and chemical products.

On October 27, 1950, plaintiff and defendant executed the written contract which is the genesis of this lawsuit. Its terms must be set forth at some length. The agreement contains the following recitals:

"Whereas, Delaware [plaintiff] is in possession of certain chemical and engineering information, formulation, know-how and other knowledge which the parties to this agreement understand to be a trade secret for the manufacture of Pentaerythritol and related Pentaerythritol products, hereinafter called P. E.; and

"Whereas, Delaware is willing for the consideration hereinafter set forth to sell the information and data in connection with the manufacture of P. E., together with providing the necessary services and instruction of Reichhold personnel in the method of production of P. E.; and

"Whereas, Reichhold [defendant] is willing to acquire such data and information and to undertake to enter into the production of P. E. at as early a date as possible. * * *"

The agreement then provided that plaintiff would forthwith impart to defendant all engineering and chemical information, formulation, know-how, data and other knowledge in its possession or to be developed by or for it pertaining to the manufacture and sale of penta. Plaintiff's employee, Spiller, was to be released from his contract with plaintiff so as to be able to enter defendant's employment in order to assist defendant in the training of personnel and in the construction of a plant to make penta. It was agreed that Spiller was not released from his contract with plaintiff so far as divulging trade secrets, except

to defendant, was concerned. It was agreed that plaintiff would permit a staff of defendant's technicians and employees to enter its plant for training in the manufacture of penta, where they would have the assistance of Spiller and plaintiff's employees.

Plaintiff agreed to assist defendant in obtaining equipment and raw materials for the manufacture of penta and to perform any reasonable act to assure defendant of the successful manufacture of penta. Plaintiff agreed to continue to manufacture penta at full capacity at least until defendant commenced its manufacture; plaintiff to supply and defendant to buy at the prevailing market price all penta not contracted for by or committed to plaintiff's other customers.

As compensation for plaintiff's performance of the contract, defendant agreed to pay plaintiff as an advance royalty $17,000 at the execution date of the contract, $17,000 by note payable 30 days after date, and $16,000 by note payable 60 days after date. Defendant agreed to pay plaintiff a "royalty" on all penta produced at rates set forth in the agreement. The payments were to begin when defendant started production and to continue for ten years. When the sum of the payments reached $275,000 defendant would take credit for the $50,000 advance made by the cash and notes.

Defendant undertook to commence preparation promptly for the erection of a plant to produce at least 1,000,000 pounds of penta per month. The plant was to be ready for operation in the first quarter of 1952. Defendant agreed to operate the plant for at least five years at the maximum possible productive rate consistent with defendant's best efforts and ability to use and sell penta, provided prevailing conditions did not render the production uneconomical.

It was agreed that if defendant did not perform in accordance with the foregoing provisions and had not paid plaintiff $275,000 in royalties (presumably in five years) plaintiff could freely use and divulge the information forming the subject matter of the contract.

Plaintiff agreed after receipt of $275,000 in payments to discontinue, at defendant's request, the manufacture of penta and to transfer its asset (with some exceptions) to defendant, presumably without further payment. Paragraphs 7 to 10 of the Agreement follow:

"7. Delaware [plaintiff] will not make, directly or indirectly, a similar arrangement with any other company or individual, and particularly will not give any information to an outsider about their process, trade secrets, know-how developed so far or to be developed in the future. This obligation remains in force for a period of ten years after the expiration of this agreement.

"Reichhold [defendant] shall not give any information about the process, know-how and trade secrets to any unauthorized person, firm or corporation outside the Reichhold organization.

"8. If this contract should be terminated due to a default by either party before the term herein provided, then that party in default shall not thereafter in any way or manner make known, disclose or communicate any information obtained through the terms of this contract to any person, firm or corporation, nor will they commit any act detrimental to the interest of the other party in the manufacture or sale of P. E.

"9. Delaware agrees that except as set forth in paragraph 3 during the term of this contract and for ten years thereafter not to directly or indirectly enter or continue in the manufacture of P. E., nor in any way or manner make known, disclose or communicate any information which is the subject matter of this contract to any person, firm or corporation.

"10. Reichhold may upon written notice deliver to Delaware prior to January 1, 1951, withdraw from the terms of this contract. If this agreement is terminated by virtue of the provisions of this paragraph, Reichhold will forfeit the payment of $50,000.00 made in accordance with paragraph 4 hereof. * * *"

Plaintiff alleges that after the execution of the agreement it disclosed to defendant all its engineering and chemical information, formulation, know-how and data and all other knowledge in its possession to enable defendant to commence the manufacture and production of penta on a commercial basis. Defendant admits that information, etc., was conveyed by plaintiff to it but denies that such information, etc., was valuable "know-how". This issue need not now be resolved.

Plaintiff permitted defendant to send its officers and employees to plaintiff's office and plant and permitted them complete access to all records and data in plaintiff's possession relating to the production of penta. Plaintiff permitted photographs to be taken and allegedly answered fully and completely all questions by defendant's officers and employees and in every way cooperated to the fullest extent possible in relaying to defendant all plaintiff's trade secrets relating to the manufacture and production of penta. Defendant has denied that a full disclosure was made or that plaintiff disclosed valuable trade secrets to defendant. I need not decide this now.

Plaintiff released George Spiller from his employment with plaintiff and permitted him to enter the employ of defendant to assist defendant in training its personnel in the techniques for the manufacture and production of penta and to assist in the construction of a plant to be used in such manufacturing.

By letter dated December 29, 1950, defendant elected to terminate the agreement pursuant to Paragraph 10 thereof.

After receipt of the termination notice, plaintiff through its agent discussed the agreement and termination thereof with the chairman of the board of directors of defendant and the said chairman stated, "that defendant would always honor such contract and that the terms of said contract would at all times apply to the manufacture or production of pentaerythritol by defendant" (Para. 13). Defendant's answer denies this allegation but, once again, I need not now resolve this conflict.

In May, 1954, plaintiff, acting upon information and brief, notified defendant in writing that it had reason to believe that the defendant intended to violate both the express and implied conditions of the agreement and the statement of the chairman of the board, and enter the business of manufacturing and producing penta.

Plaintiff alleges that defendant in willful violation of its agreement is now manufacturing penta or is manufacturing penta using a process which it obtained from plaintiff under the terms of the agreement, or is manufacturing penta by a process derived from the engineering and chemical information, formulation, know-how, data and other secret

knowledge supplied by the plaintiff in trust and in confidence. Defendant denies these allegations and they are therefore in dispute. At this time they do not affect the pending motions.

Under its first cause of action plaintiff prays for an injunction: (1) preventing defendant from engaging in the manufacture of penta and from using the engineering and chemical information, formulation, know-how, data and other secret knowledge in its possession and disclosed to it by plaintiff or derived therefrom by defendant; (2) preventing defendant from disclosing the same to any other person, firm or corporation and ordering it to submit to the Court for destruction all records, documents and reports in its possession containing any reference to the engineering and chemical information, formulation, know-how, data and other secret knowledge disclosed to it by plaintiff or derived therefrom by defendant; (3) ordering defendant to account to plaintiff with respect to the manufacture of penta and to pay to plaintiff all profits made or realized from the manufacturing of penta; (4) ordering defendant to pay damages in an amount equivalent to what plaintiff's profits would have been on all the penta manufactured, had said penta been manufactured by plaintiff; and (5) ordering defendant to pay punitive damages.

Plaintiff's second cause of action alleges that by reason of defendant's willful and wrongful appropriation and disclosure of plaintiff's intellectual property valued at $1,000,000, plaintiff has been damaged. Plaintiff requests only a money judgment on its second cause of action.

Defendant's answer denied plaintiff's basic allegations as to the valuable character of the subject matter transferred to it under the contract and also set forth four affirmative defenses. It also contained two counterclaims, both seeking damages: one, on the basis of plaintiff's alleged deceit and false representation, and the second, on the basis of losses occasioned by reliance upon plaintiff's contractual representations.

Plaintiff's reply to defendant's counterclaims puts the material allegations thereof in issue and also sets forth four affirmative defenses to the counterclaims, including statute of limitations.

I first consider defendant's motion for summary judgment. Defendant argues that the Court of Chancery lacks jurisdiction of the causes of action set out in the complaint. Defendant first points out that this Court clearly would have no jurisdiction of the second cause of action standing alone, because it is admittedly an action sounding in tort for a money judgment. We can assume this is true. Defendant then contends that since the first cause of action is in contract plaintiff can only have an action for royalty payments under the terms of the contract. And this, says defendant, would be an action for money and, therefore, also a matter for the Superior Court. The point defendant misses is that it admittedly elected to terminate the agreement pursuant to its terms. Plaintiff was entitled to assume that defendant meant what it said. When defendant allegedly committed acts contrary to its obligation to refrain from using or disclosing the "know-how" which it had decided not to buy, plaintiff was entitled to seek protection, not by way of a suit for royalties—because that would be contrary to the nature of the termination—but by way of an injunction to protect plaintiff's rights in the "property" which defendant had indicated it did not desire to purchase.[2] *Gronemeyer v. Hunter Mfg. Co.,* 34 *Del.Ch.* 515, 106 *A.2d* 519. The additional prayer for an accounting is consistent with plaintiff's theory and does not defeat this Court's jurisdiction. Defendant also suggests that the defendant performed the contract and so this Court has no jurisdiction. The defense of performance does not defeat jurisdiction here in view of the allegations of the complaint.

Plaintiff has therefore clearly stated in its first cause of action a claim which is within this Court's jurisdiction. Defendant does not contend that the second cause of action for damages should be dismissed independently of this Court's determination of its jurisdiction over its first cause of action. I therefore conclude that defendant's motion for summary judgment based upon the lack of this Court's jurisdiction over the subject matter of the complaint should be denied.

Defendant also seeks a summary judgment of dismissal of an alleged oral agreement based principally on the allegations of Paragraph 13 of the complaint. At the oral argument plaintiff's counsel

---

2. I need not now decide the impact of Paragraph 9 of the agreement.

explicitly stated that plaintiff did not by such allegations intend to reply on any oral contract as an independent basis for relief in this case. In view of this concession it becomes unnecessary to consider the various arguments addressed to this matter by defendant.

I next consider plaintiff's motion seeking summary judgment on its first affirmative defense that the defendant's counterclaims should be dismissed because they are barred by the statute of limitations.

Defendant concedes that if the statute of limitations is applicable to these counterclaims at all, then it bars them insofar as they seek affirmative relief. But defendant says, "There is no statute of limitations as to a compulsory counterclaim, *i. e.,* one which arises out of the transaction or occurrence that is the subject matter of the opposing party's claim when the opposing claim is not itself barred." Preliminarily, it may be said that defendant does not contend that the statute of limitations is inapplicable here because the proceedings are in equity rather than in law. I therefore need not consider that point.

Defendant's various arguments under this point are not easy to state. Most of them need not be considered because they are premised upon the various distinctions between common law recoupment and statutory set-off. Defendant overlooks the fact that the Court of Equity has historically entertained cross bills seeking affirmative relief if the claim asserted by cross bill arose out of the same transaction that formed the basis of the complainant's claim. See 19 *Am.Jur., Equity* § 329. Therefore this Court under its rule making power could properly adopt *Chancery Court Rule* 13(a), *Del.C.Ann.* dealing with compulsory counterclaims seeking affirmative relief.[3]

The question then is whether the Court will by analogy apply the statute of limitations to a counterclaim seeking affirmative relief in connection with the same transaction or occurrence which forms the basis of plaintiff's claim. It is generally agreed that "The purpose of statutes of limitation is to bar actions and not to suppress or deny matters of defense, whether legal or equitable; and it is a general rule that such statutes are not applicable to defenses, but apply only where affirmative relief is sought. * * * the rule under consideration [mak-

---

3. Other aspects of the rule are not now pertinent.

ing the statute inapplicable] applies only in the case of strict defenses, and in the absence of statute, does not apply to cases of set-off or counterclaim". 34 *Am.Jur., Limitation of Actions,* § 63.

The three year statute of limitations relied upon by plaintiff, 10 *Del.C.* § 8106, applies to any "action" enumerated therein. I believe a counterclaim seeking affirmative relief is an "action" within the meaning of the statute. The fact that it appears in a counterclaim cannot obscure the fact that it has all the characteristics of an independent action. Compare 47 *Am.Jur., Set-off and Counterclaim* § 4; 3 *Moore's Federal Practice,* § 13.02 (1948 ed.). This conclusion is strengthened by the fact that these counterclaims would, as independent actions, have been filed at law and would have been barred by the statute. Compare 34 *Am.Jur., Limitation of Actions,* § 65; 16 *A.L.R.* 339; 73 *A.L.R.* 580.

But defendant argues that 10 *Del.C.* § 8106 does not apply to compulsory counterclaim seeking affirmative relief. Defendant in making this argument relies upon the implication which, it asserts, exists by virtue of the language of 10 *Del.C.* § 8119 which provides:

> "The provisions of this chapter [which includes 10 *Del.C.* § 8106] shall apply to any debt alleged by way of set-off or counterclaim on the part of a defendant. The time of limitation of such debt shall be computed in like manner as if an action therefor had been commenced at the time when the plaintiff's action commenced."

Defendant says that this statute purports to cover the only type of set-off or counterclaim to which the statute of limitations was intended to apply, namely, "debt". Since these counterclaims deal with alleged torts, defendant says the statute is inapplicable. First, I believe a Court of Equity would have applied the statute of limitations by analogy in a proper case to a cross bill even before the adoption of the predecessor of § 8119. Moreover, it is clear that this statute did not purport to deal with a defendant's claim for affirmative relief. Legal set-off is a creature of statute and is purely defensive. See 1 *Woolley on Delaware Practice,* § 492. The inclusion of the words "or counterclaim" was not inserted until the 1953 *Code,* and accord-

ing to the note, this was done to bring the statute in line with the new rules. Thus, the history of the statute makes it clear that it did not touch the matter of the applicability of the statute of limitations to claims by defendants for affirmative relief.

I therefore conclude that these counterclaims seeking as they do affirmative relief of a legal nature are by analogy subject to the defense of the statute of limitations.

Finally, defendant says that in any event the counterclaims may be asserted defensively. Plaintiff contends that that matter is not now before the Court and may arise in connection with an application to amend. Since the present counterclaims clearly seek affirmative relief and since I have ruled that because they seek such relief they are outlawed by the statute of limitations, I conclude that plaintiff's motion for judgment on the counterclaims in their present forms should be granted. However, defendant may seek leave to amend so as to assert the counterclaims defensively. If the amendment is allowed, plaintiff can then proceed in an orderly way to make any further attack it desires on the amended counterclaims.

Order on notice.