The ESTATE OF BURNE HOGARTH, Burne Hogarth Dynamic Media Worldwide LLC, Michael Hogarth, as the child of deceased author Burne Hogarth, Richard Hogarth, as the child of the deceased author Burne Hogarth and Ross Hogarth, as the child of the deceased author Burne Hogarth, Plaintiffs–Appellants,

v.

EDGAR RICE BURROUGHS, INC., Defendant–Appellee.

Docket No. 02–7312.

United States Court of Appeals, Second Circuit.

Argued: Jan. 22, 2003.

Decided: Aug. 29, 2003.

Peter Herbert, Lankler Siffert & Wohl LLP, New York, N.Y. (David B. Smallman, Steinhart & Falconer LLP, New York, N.Y., on the brief), for Plaintiffs–Appellants.

Roger L. Zissu, New York, N.Y. (Evan C. Gourvitz, Fross Zelnick Lehrman & Zissu, P.C., New York, N.Y., on the brief), for Defendant–Appellee.

Before: NEWMAN, KATZMANN, and RAGGI, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

Once again, Tarzan presents this Court

with copyright issues.[1] The issues, arising under the 1909 Copyright Act, Pub.L. No. 60–349, 35 Stat. 1075 (1909), *codified at* 17 U.S.C. § 24 *et seq.* (1976) ("1909 Act"), concern the work-for-hire doctrine as applied to an independent contractor, the significance of incorrect information in applications for registration filed with the Register of Copyrights, and laches. The appeal also presents contract issues. The Plaintiffs–Appellants—the Estate of Burne Hogarth, Burne Hogarth Dynamic Media Worldwide LLC, and three of Hogarth's children (collectively "Hogarths")—appeal from the March 21, 2002, judgment of the District Court for the Southern District of New York (Denise L. Cote, District Judge) entered after a bench trial. The District Court ruled in favor of the Defendant–Appellee Edgar Rice Burroughs, Inc. ("ERB"), rejecting the Hogarths' claims for a declaratory judgment that Burne Hogarth, a well known illustrator, was the author of two books and as such entitled to copyright in the original and renewal terms. The books are pictorial versions of *Tarzan of the Apes* and of stories from *Jungle Tales of Tarzan* (collectively "the Books"). The Hogarths claimed to have succeeded to Burne Hogarth's rights in the Books upon his death. The Court also rejected the Hogarths' claim that they had a contract right to receive a portion of licensing revenues paid to ERB by the Walt Disney Company ("Disney") and a right to have some of Hogarth's original artwork returned. We affirm.

## Background

The facts are meticulously detailed in Judge Cote's comprehensive opinion. *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,* No. 00 CIV. 9569(DLC),

2002 WL 398696 (S.D.N.Y. Mar.15, 2002) (*"Dist.Ct.Op."*). We recount only those facts necessary to understand and resolve the issues on appeal. Applying the "clearly erroneous" standard of review, we accept the District Court's findings of subsidiary facts, except for those findings related to certain aspects of the steps taken in the Office of the Register of Copyrights ("Copyright Office"). As to these, we have been greatly aided by a response from Marybeth Peters, Register of Copyrights ("Register"), to inquiries we submitted to the Copyright Office after oral argument of the appeal. *See* Letter of Marybeth Peters, Register of Copyrights, to Roseann MacKechnie, Clerk, U.S. Court of Appeals for the Second Circuit (April 8, 2003) (*"Peters Letter"*). Our account of those steps will supplement and slightly modify the District Court's account, but will not change any of the Court's conclusions of law.

*Creation of the Books.* Edgar Rice Burroughs published *Tarzan of the Apes,* the first of his 26 Tarzan novels, in 1912. *Jungle Tales of Tarzan* was published in 1916–17. Both works are now in the public domain in the United States. Burroughs formed ERB in 1923 to manage his literary rights.

In 1937, Burne Hogarth ("Hogarth") was hired by United Features Syndicate, Inc. to illustrate the syndicated comic strip "Tarzan" and continued this work until 1950. "During that time, he developed a highly distinctive and still widely acclaimed style of illustrating Tarzan and his universe." *Dist. Ct. Op.* at *2.

In the 1960s, Hogarth and Robert M. Hodes, then Vice President of ERB, had discussions out of which emerged the idea of a new series of Tarzan books. In July

---

1. Tarzan's prior appearances in this Court include *Keller v. Lee,* 152 F.3d 918 (2d Cir. 1998) (table), *Burroughs v. Metro–Goldwyn–Mayer, Inc.,* 683 F.2d 610 (2d Cir.1982), and *Burroughs v. Metro Goldwyn Mayer, Inc.,* 636 F.2d 1200 (2d Cir.1980) (table).

1970, Hodes wrote to Hogarth, suggesting production of "a quality, high priced edition of an adult version of TARZAN OF THE APES in graphic form." *Id.* at *3 (internal quotation marks omitted). In another letter, Hodes proposed terms for the project that would provide the basis for the eventual agreement between ERB and Hogarth. The letter stated:

> 1. We would commission you to produce the work at a cost that would be paid one-half now and one-half out of the first proceeds of the book .... That one-half deferred payment is the extent of your speculation, or risk.
>
> 2. We would undertake to find a U.S. publisher .... All expenses would be borne by us, and this, together with the sum paid to you, would be our risk.

*Id.* at *4.[2] Hogarth responded: "Your proposal sounds like a capital idea." *Id.*

Later in 1970, ERB identified Watson–Guptill Publications, Inc. ("Watson–Guptill") as a likely publisher. This firm had previously published Hogarth's art instruction books. In proposing a contract between ERB and Watson–Guptill, Hodes wrote the firm's editor, with a copy to Hogarth:

> 1. Your contract is directly with [ERB]. We undertake to provide the services of Burne Hogarth to furnish you with artwork and text for your proposed illustrated book of Tarzan of the Apes....
>
> 2. You are responsible for designing and producing the book, and, in general, supervising Mr. Hogarth's work.... We reserve the right to require all parties to produce a book that reasonably and substantially tells the story of Tarzan of the Apes as Edgar Rice Burroughs told that story in his classic novel.... As for the

artwork itself, we cannot and do not presume to influence or control the work of Mr. Hogarth.

*Id.*

*The ERB–Hogarth Contract.* In an agreement dated November 16, 1970 ("1970 Agreement"), signed by Hogarth in 1971, ERB and Hogarth established the terms for the creation of the first and subsequent books. It included the following provisions:

> [¶ 1] You [Hogarth] will create a book along the lines we [ERB] have discussed with Watson–Guptill based upon approximately one-half of Tarzan of the Apes .... The creative details will be worked out between you and our publisher.
>
> [¶ 2] We will have the right to approve the content of the books, but our sole interest in this regard will be to preserve the Burroughs "flavor." We may give you our artistic suggestions from time to time, but you will be the final judge of the artwork as distinguished from the story or text.
>
> [¶ 3] For all of your services and for all rights being granted, we will pay you, your estate [and] heirs ... for the term of the copyright, including renewals:
>
> (a) $2,500 on January 1, 1971;
>
> (b) $2,500 on the completion of all your work; and
>
> (c) 50% of all net monies realized by us from the exploitation of the book.
>
> .    .    .    .    .
>
> [¶ 5] ... You will create the subsequent books and we agree not to employ anybody else to create them....
>
> .    .    .    .    .
>
> [¶ 7] We agree that the physical possession and ownership of the original

---

**2.** In this and all subsequent quotations from the District Court's opinion, we have omitted

the emphases supplied by Judge Cote in her quotation of the relevant documents.

artwork shall be shared on the following basis: We shall own the originals for the first book, you shall own them for the second book, we for the third book, you for the fourth book and so on. We have indicated to you that we desire the physical possession and ownership of the foregoing artwork in order to place it in an Edgar Rice Burroughs Museum....

[¶ 8] The book will be copyrighted in the name of [ERB] and we shall be the exclusive proprietors thereof, subject always to our obligation to pay you your participation. You hereby grant us whatever rights we need to obtain the copyright in our name and to extend and renew that copyright wherever and whenever we can.

1970 Agreement; *see also Dist. Ct. Op.* at *5–*6.

In February 1972, ERB made an agreement with Watson–Guptill, granting it worldwide English language hardcover publication rights in the first book and the option to publish subsequent books. ERB warranted that it was the "sole author and proprietor" of the first book. *Id.* at *7.

*The Books.* The first book, published in 1972 ("the 1972 book"), is 157 pages in length, of which 122 pages contain panels of color illustrations and text, with one to four panels per page. The text is a combination of narration and quotations of what the characters shown on a panel are saying. The title page shows the title as "Tarzan of the Apes" and credits the creators in these words:

BY BURNE HOGARTH

Original text by Edgar Rice Burroughs adapted by Robert M. Hodes

The second book, published in 1976 ("the 1976 book"), is 157 pages in length, of which 122 pages contains panels of black and white illustrations and text, of a style similar to that of the 1972 book. The title page shows the title as "Jungle Tales of Tarzan" and credits the creators in these words:

BY BURNE HOGARTH

Original text by Edgar Rice Burroughs adapted by Burne Hogarth and Robert M. Hodes

Neither the 1972 nor the 1976 book enjoyed substantial sales.

*The Copyright Registrations.* The application for the original term registration for the pictorial version of *Tarzan of the Apes* was filed in 1973 by Watson–Guptill.[3] It identifies as the claimant "Edgar Rice Burroughs, Inc." and as the authors "Edgar Rice Burroughs ... (deceased)" and "(illustrated) by Burne Hogarth." In 1999, counsel for ERB submitted an application for a supplementary registration, which identifies the sole author as "Edgar Rice Burroughs, Inc.," and states the explanation for the "correction" as "Work was one made for hire."

Three applications for renewal term registrations were submitted for *Tarzan of the Apes.* On December 6, 2000, Danton Burroughs, on behalf of ERB, submitted an application for a renewal registration listing the author of renewable matter as "Edgar Rice Burroughs, Inc." ("first renewal application"). On December 8, 2000, counsel for Hogarth's children submitted an application for a renewal registration listing the author of renewable matter as "Burne Hogarth" ("second renewal application"). On June 4, 2001, counsel for ERB submitted an application for a renewal registration listing the author of renewable matter as "Edgar Rice Burroughs,

---

3. As previously noted, the registrations for the original text versions of *Tarzan of the Apes* and *Jungle Tales of Tarzan* were filed before 1920, and these works are now in the public domain.

Inc." [4] ("third renewal application"). Counsel for ERB subsequently advised the Copyright Office that, at the time of filing the third renewal application for ERB, he had been unaware of the earlier filing of the first renewal application on behalf of ERB.

The first renewal application was received by the Copyright Office on December 15, 2000, and that date would in the normal course have become the effective date. *See* 17 U.S.C. § 410(d)(2000) (effective date of copyright registration is day on which application, deposit, and fee are received). However, for reasons that the Register of Copyrights cannot explain, the examiner handling the renewal claims processed the third renewal application. *See Peters Letter* at 12–13. Reviewing its records as a result of this Court's inquiry, the Copyright Office concluded that the examiner should have processed the first renewal application, rather than the later filed third renewal application. The Copyright Office therefore issued a new certificate of renewal registration with an effective date of December 15, 2000, and cancelled the inadvertently processed third renewal registration.[5]

The second renewal application was also received on December 15, 2000, and given a December 15, 2000, effective date. Thus, the Copyright Office has two renewal registrations for *Tarzan of the Apes* with an effective date of December 15, 2000, one identifying ERB as the author and the claimant, and the other identifying Hogarth as the author and Hogarth's children as the claimants.

The application for the original term registration for *Jungle Tales of Tarzan* was filed by Watson–Guptill in 1976. It identifies as the claimant "Edgard [*sic*] Rice Burroughs, Inc." and as the author "Burne Hogarth." In 1979, Marion T. Burroughs, the daughter-in-law of Edgar Rice Burroughs and an officer of ERB, filed an application for a supplementary registration to make two changes to the original registration. First, the misspelling "Edgard" in the name of the claimant was corrected to "Edgar." Second, under the blank for "AMPLIFIED INFORMATION," the application stated: "Add name of EDGAR RICE BURROUGHS as author of original text. Citizenship: USA (deceased)." The author was listed as "Burne Hogarth," as it had been on the original application. In 1999, counsel for ERB filed an application for a second sup-

---

4. The certificate issued on the basis of this application modified three entries. Within the blank headed "TITLE OF WORK IN WHICH RENEWAL IS CLAIMED," which had stated "Tarzan of the Apes," was added "*by Edgar Rice Burroughs." Within the blank headed "AUTHOR(S) OF RENEWABLE MATTER," which had stated "Edgar Rice Burroughs, Inc.," was added "* illustrated by Burne Hogarth." Within the blank headed "RENEWABLE MATTER," the description was limited to "pictorial matter*." The certificate explains that items marked by an asterisk are "Amended by C.O. [Copyright Office] from original registration, limiting new matter to 'pictorial version.'"

5. Although without consequence to our decision, some confusion remains concerning the

replacement of the inadvertently processed third renewal application. The Register informs us that the Office issued the replacement certificate "using the earlier December 15, 2000 application submitted by [ERB]." *Peters Letter* at 13. However, that application is dated December 6, 2000, and bears no handwritten signature; the replacement certificate, sent to us by the Register, bears the handwritten signature of Danton Burroughs and the date November 30, 2000. In any event, both the unsigned application filed by Danton Burroughs on December 6, 2000, and the signed application filed by Danton Burroughs on November 30, 2000, list the author of renewable matter as "Edgar Rice Burroughs, Inc."

plementary registration to identify "Edgar Rice Burroughs, Inc." as the author instead of "Burne Hogarth." Under "Explanation of Correction," this second application stated: "Work was one made for hire."

No renewal application has yet been filed for *Jungle Tales of Tarzan* because its renewal term will not begin until January 1, 2005, 28 years after the 1976 publication.

*The ERB–Disney License.* In an agreement dated April 1, 1994, ERB licensed Disney to use the Tarzan character and stories in animated movies and television programs ("Disney license" or "the license"). Paragraph 1(a) of the agreement defined the scope of the license to include

> the characters, plots, settings, themes, and incidents contained in or suggested by all or any portion of the stories ... written by Edgar Rice Burroughs, schedules of which are attached hereto as Exhibit "A" and Exhibit "B."

*Dist. Ct. Op.* at *14. Exhibits A and B list the 25 Tarzan novels written by Burroughs for which U.S. or Berne Convention copyright protection existed in 1994. *Id.* Neither of the Books at issue in this litigation are included in these exhibits. *Id.* at *26.

In paragraph 14(b)(ix) of the license, ERB warrants

> (A) That, except as set forth in Exhibits "A" and "B," ... to the best of [ERB's] knowledge, there are no other stories authorized by [ERB] or its predecessors in interest in which the TARZAN character appears. If there are any other Stories in which [ERB] has an interest,

such stories shall be deemed Stories hereunder to the extent of [ERB's] rights therein, in any.

*Id.* at *15.

Disney released its Tarzan movie in 1999. Pursuant to the license, Disney paid ERB $15 million, $12 million to buy out ERB's share of Disney revenues from Tarzan merchandise and $3 million based on box office receipts from the movie.

*The Pending Litigation.* Burne Hogarth died in 1996. In September 1999, two months after Disney's release of its Tarzan movie, counsel for the Hogarth estate sent a cease-and-desist letter to Disney, claiming that the movie infringed Burne Hogarth's copyrights in the Books. Both Disney and ERB rejected the claim. The Hogarths then brought the pending litigation, alleging three claims: (1) that Burne Hogarth was the sole author of the Books and that his heirs are entitled to the renewal term copyrights in the Books; (2) that the Hogarths are entitled to a share of the proceeds ERB received from Disney; and (3) that ERB breached paragraph 7 of the 1970 Agreement by retaining possession of the original artwork for the 1972 Book but failing to establish a museum for its display.

ERB's answer, denying the Hogarths' claims, contained no counterclaim, but did include, in the prayer for relief, a request that the Court declare "that [ERB] is owner of all copyright rights, including the renewal copyrights" in the Books. By the time of the trial, the District Court understood ERB to be contending, among other things, that the Books were works for hire.[6]

---

**6.** How ERB placed its work-for-hire contention before the District Court is not clear from the pleadings. ERB's answer does not assert, either as an affirmative defense or in a counterclaim, that the Books were works for hire. The answer includes, as an affirmative defense, that the Hogarths' claims to own exclusive rights in the renewal terms are barred "because, without regard to whether Hogarth's contributions thereto were work for hire, the [Books] were created by Burroughs and Hogarth as joint works under the U.S.

*The District Court's Decision.* After a bench trial in 2002, Judge Cote rejected all of the Hogarths' claims. With respect to the copyright claim, she ruled (1) that, although the copyright registrations constituted prima facie evidence that Burne Hogarth was the author, as stated in the registrations, the evidence established that the registrations were not reliable, *Dist. Ct. Op.* at *18; (2) that "[i]n the Second Circuit 'an independent contractor is an "employee" and a hiring party is an "employer" for purposes of the [1909 Act] if the work is made at the hiring party's instance and expense,' " *id.* (citing *Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 554 (2d Cir.1995)) (emphases deleted); (3) that the Books were created at the "instance and expense" of ERB, *id.* at *19–*20; (4) that the Books are works for hire, *id.* at *23; and (5) that ERB, as an employer in the case of works made for hire, is the "author" for purposes of the 1909 Act and entitled to the copyrights in the original and renewal terms, *id.* at *18–*24.

With respect to the Hogarths' laches defense, Judge Cote ruled that, although the registrations listing Burne Hogarth as the author remained uncorrected for many years, the existence of incorrect registrations alone did not establish a laches defense and that ERB had promptly acted to assert its copyright claims as soon as adversity developed between the Hogarths and ERB. *Id.* at *24–*25. With respect to the Hogarths' contract claims, Judge Cote ruled that the Disney license gave Disney only the right to use the character Tarzan and the stories listed in Appendix A and Appendix B of the license, and not any rights with respect to the Books. *Id.* at *25–*27. The Court also ruled that, even

if Disney acquired rights in the Books, the 1970 Agreement did not give Hogarth any right to revenue received by ERB by virtue of the Disney license, *id.* at *28–*29. Finally, as to the Hogarths' claim concerning original artwork, Judge Cote ruled that ERB had not promised to build a museum to house Hogarth's drawings and had not breached the clause of the 1970 Agreement concerning original artwork. *Id.* at *29.

The District Court's judgment denies all of the Hogarths' claims, but neither grants nor denies the request in ERB's answer for a declaration that it owns all copyrights, including renewal copyrights in the Books.

### Discussion

#### I.  Copyright Claim

##### A.  Work for Hire and the Renewal Term

Two concepts of copyright law under the 1909 Act are at issue on this appeal—a work made for hire and the renewal term. The 1909 Act provides no definition of "work made for hire," but it states the consequence of that designation. "[T]he word 'author' shall include an employer in the case of works made for hire." 1909 Act § 26. Thus, with respect to works made for hire, the employer is legally regarded as the "author," as distinguished from the creator of the work, whom Learned Hand referred to as "the 'author' in the colloquial sense." *Shapiro, Bernstein & Co. v. Bryan,* 123 F.2d 697, 699 (2d Cir.1941). The concept of a "work made for hire" remains in the Copyright Act of

---

copyright laws," presumably referring to the definition of "joint works" in the Copyright Act of 1976, 17 U.S.C. § 101 (2000). That definition, referring to the "prepar[ation]" of a work "by two or more authors," is properly

understood to cover a work of co-authorship. *See Childress v. Taylor,* 945 F.2d 500, 504 (2d Cir.1991). At oral argument, however, both sides disclaimed co-authorship.

1976, 17 U.S.C. § 101 *et seq.* (2000) ("1976 Act"), which defines the phrase to mean "a work prepared by an employee within the scope of his or her employment" or, for certain types of works, "a work specially ordered or commissioned." *Id.* § 101 (2000); *see Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("*CCNV* ").

The second concept—the renewal term—is a distinctive feature of the 1909 Act, not carried into the 1976 Act for works created on or after January 1, 1978, *see* 17 U.S.C. § 302(a) (establishing single copyright term).[7] As enacted, the 1909 Act authorized an original term of 28 years and a renewal term of an additional 28 years,[8] if application for the renewal term was made "within one year prior to the expiration of the original term."[9] 1909 Act § 24. An important aspect of the renewal term is that, although it is assignable by the author, *see Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 647–59, 63 S.Ct. 773, 87 L.Ed. 1055 (1943), the assignment of the "expectancy" in acquiring the renewal term, *see Miller Music Corp. v. Charles N. Daniels, Inc.,* 362 U.S. 373, 375, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960), is voided by the author's death prior to the date when the renewal term vests, *see* 1909 Act § 24; *Miller Music,* 362 U.S. at 374–78, 80 S.Ct. 792. In that event, the renewal right belongs to the author's surviving spouse or children, if living, or, if they are not living, to the author's executor. *See* 1909 Act § 24; *Miller Music,* 362 U.S. at 376, 80 S.Ct. 792. However, in the case of a work made for hire, the proprietor of the copyright in the original term, *i.e.,* the employer or its assignee, is entitled to the renewal term. 1909 Act § 24.

In the pending litigation, the concepts of a work made for hire and the renewal term are at issue concerning a work claimed to be "commissioned." ERB makes no claim that Burne Hogarth was its employee. Instead, ERB contends that Hogarth was an independent contractor whom ERB commissioned to create original artwork for the Books under circumstances that render the Books works for hire under the case law of this Circuit. This claim raises the issue of whether a commissioned work should be considered a work for hire under the 1909 Act, in which

---

7. The 1976 Act replaced the renewal term of the 1909 Act with a new provision, applicable to "any work other than a work made for hire," permitting termination of "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978," 17 U.S.C. § 203(a), within "a period of five years beginning at the end of thirty-five years from the date of execution of the grant," *id.* § 203(a)(3). The legislative history explains:

> [The termination provision is] based on the premise that the reversionary provisions of [section 24 of the 1909 Act] should be eliminated, and that [the 1976 Act] should substitute for them a provision safeguarding authors against unremunerative transfers. A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited.

H.R.Rep. No. 94–1476, at 124 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5740.

8. The duration of the renewal term was extended to 47 years by the 1976 Act, 17 U.S.C. § 304(a)(1)(C) (1982), and to 67 years by the Sonny Bono Copyright Term Extension Act, 17 U.S.C. § 304(a)(1)(C) (2000). *See Nimmer on Copyright* § 9.11[A]-[B] (2003).

9. The Copyright Renewal Act of 1992, Pub.L. No. 102–307, 106 Stat. 264, *codified at* 17 U.S.C. § 304(a)(2)(A)(ii), provides for automatic extension, but also provides advantages for claiming renewal within one year of the expiration of the original term. *Id.* at § 304(a)(2)(A)(i).

event the right to obtain the renewal term belongs to the commissioning party, or whether that right remains with the commissioned party, absent an assignment to the contrary. In the pending case, where the commissioned party, Burne Hogarth, assigned to the commissioning party, ERB, his renewal right (technically, the "expectancy" in acquiring the renewal term, *see Miller Music Corp.*, 362 U.S. at 375, 80 S.Ct. 792), *see* 1970 Agreement, ¶ 8, and then died before the renewal term vested, the issue of whether the Books are works for hire is critical because, if they are not, Hogarth's death during the original term would leave the renewal right with his children. *See* 1909 Act § 24; *Miller Music*, 362 U.S. at 374–78, 80 S.Ct. 792.

*Commissioned works under the 1909 Act.*[10] In a series of cases decided over more than sixty years, this Court has considered the status of commissioned works under the 1909 Act, with respect to both the original copyright term and the renewal term. In the process, we have developed what the Fifth Circuit describes as "an almost irrebut[t]able presumption that any person who paid another to create a copyrightable work was the statutory 'author' under the 'work for hire' doctrine." *Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises*, 815 F.2d 323, 327 (5th Cir. 1987) (reviewing relevant Second Circuit cases).

Our Court first recognized a "presumption" in favor of a commissioning party in 1939 in *Yardley v. Houghton Mifflin Co.*,

108 F.2d 28 (2d Cir.1939), a case involving an artist who had been commissioned by the City of New York to paint a mural. The artist had died before the expiration of the copyright's original term, and his sister claimed to own a copyright for the original term by virtue of an assignment from her brother's executor. In addition, the sister had filed for and obtained a registration for the copyright's renewal term.

Focusing on the original term, we ruled that, although the contract commissioning the artist's work was silent as to which party would hold the copyright, and although the artist had included a copyright notice in his favor on the painting, this term belonged to the City because it had commissioned the artist to paint the mural. *Id.* at 30–32. In so holding, we adopted a "presumption" that the commissioning party "desires to control the publication of copies" of the commissioned work and that the artist "consents" to such control in the absence of a contract to the contrary. *Id.* at 31. Our conclusion that the artist "consents" to his patron's right to control reproduction of the commissioned work, coupled with the absence of any reference to the work as a "work for hire," may have been intended to reflect a conclusion that the copyright for the original term and the expectancy of a copyright for the renewal term were transferred by the artist to the patron by *an implied assignment*, in which event the artist's heirs or executor would retain renewal rights if the artist died before the renewal term vested.[11]

---

**10.** Judge Katzmann does not join this part of the opinion because he believes it is not necessary to the decision we reach in this appeal.

**11.** It is possible that the implied assignment rationale of *Yardley* applied only to the original term of the copyright, in which event the executor would have been entitled to apply for the renewal term because the right to the

expectancy in the renewal term, if not impliedly assigned, would have remained the property of the decedent. Whether the executor was entitled to apply for the renewal right because the expectancy in the renewal right was deemed to be within the scope of the implied assignment and then voided by the death of the artist during the original term, or because that expectancy was deemed not

Some support for this conclusion can be drawn from our rejection of the sister's renewal claim on the ground that "only [the artist's] executor could legally obtain a renewal." *Id.* at 32 (citing *Fox Film Corp. v. Knowles*, 261 U.S. 326, 43 S.Ct. 365, 67 L.Ed. 680 (1923)). Presumably, if we had regarded the mural as a work for hire, the commissioning party would have been deemed in law the author and, as such, would have been entitled to the copyright for both the original and the renewal terms, regardless of whether the artist had died during the original term. *See Shapiro, Bernstein*, 123 F.2d at 699–700; *Tobani v. Carl Fischer, Inc.*, 98 F.2d 57, 59–60 (2d Cir.1938). On the other hand, because the sister had conceded that only the executor "could legally obtain a renewal," *Yardley*, 108 F.2d at 32, we had no occasion to consider the effect, if any, of the *Yardley* presumption on a renewal right dispute between the executor and the City.

We seemed to resolve the question of renewal rights in commissioned works in 1955, when we considered a work (song lyrics) created "as a special job assignment, outside the line of [the lyricist's] regular duties" for his employer. *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 221 F.2d 569, 570 (2d Cir.), *modified on other grounds*, 223 F.2d 252 (2d Cir.1955) ("*Vogel Music II*").[12] The District Court had found that the employer paid the lyricist $25 "for the lyric and his rights therein." *Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 115 F.Supp. 754, 757 (S.D.N.Y.1953) ("*Vogel Music I*"). We ruled that the lyricist's right to the copyright for the original term "passed to [the employer] under [the lyricist's] original

contract with [the employer] to write a lyric." *Vogel Music II*, 221 F.2d at 570. But we also ruled that the lyricist retained his right to the renewal term (until he subsequently assigned that right to a third party). *Id.* Although we did not amplify this conclusion, the District Court had explained: "Since [the lyricist] was not [the employer's] employee for hire, [the employer] had no renewal interest in the [lyricist's] lyric." *Vogel Music I*, 115 F.Supp. at 760.

Ten years later, in *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir.1966), we "merged" the *Yardley* presumption into the work-for-hire doctrine, as the Fifth Circuit characterized our approach, *see Easter Seal Society*, 815 F.2d at 326, thereby laying the foundation for the law as it now stands in this Circuit. *Brattleboro* concerned a claim of copyright infringement during the original term brought by merchants who had requested a newspaper to design and publish advertisements. In ruling that the merchants were entitled to copyrights in their ads, we, for the first time, explicitly applied to "independent contractors," 369 F.2d at 568, *i.e.*, the newspaper, the "instance and expense" standard that had previously been used for determining when an employee's work should be deemed to be a work for hire, which would result in the employer's right to the copyright for both the original and the renewal term. *Id.* at 567–68 (citing *Nimmer on Copyright* 238 (1964)). *Brattleboro*, like *Yardley*, did not refer to the works, *i.e.*, the ads, as works for hire. But *Brattleboro*, unlike *Yardley*, did identify the work-for-hire

---

within the scope of the implied assignment, *Yardley*'s use of an implied assignment rationale strongly indicates that the work was not regarded as a work for hire. The important point is that the commissioning party was not entitled to the renewal right.

12. The creator of the lyrics in *Vogel Music II* was in fact an employee of the company that had contracted with him, but the lyrics were created "as a special job assignment, outside the line of his regular duties." *Vogel Music II*, 221 F.2d at 570.

doctrine as "the grounds" for the Court's disposition. *Id.* at 567. After reviewing the principles applicable to work-for-hire claims, *Brattleboro* specifically observed: "We see no sound reason why these same principles are not applicable when the parties bear the relationship of employer and independent contractor." *Id.; see Easter Seal Society,* 815 F.2d at 326 (describing cited language as *Brattleboro*'s "critical twist" on established work-for-hire doctrine). Although we had no occasion in *Brattleboro* to consider the parties' rights in a copyright for the renewal term, the cited language, if not the facts in *Brattleboro*,[13] provided support for our subsequent holding in *Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213 (2d Cir.1972).

*Picture Music* involved a songwriter who was asked by a music publisher to adapt music and one line of a lyric from an animated movie into a new song. For her efforts she received a percentage of song royalties. She claimed an interest in the renewal term of the copyright in the song. In rejecting her claim, this Court ruled that the songwriter had acted "in the capacity of an independent contractor"; that the music publisher and the creator of the movie were the " 'motivating factors' " in the composition of the new song; that they had the power to "accept, reject, or modify" the song; and that these circumstances rendered the song a work for hire. *Id.* at 1217.

Somewhat extending this Court's earlier decisions,[14] *Picture Music* stated that the "instance and expense" test, which had previously been used to identify an *employee's* work as a work for hire and to deem a *commissioned party* to have *assigned* to the commissioning party a copyright for the original term, would now be used to determine whether a commissioned work was a work for hire, thereby entitling the commissioning party to the renewal term in addition to the original term. Rejecting a distinction between an employee and an independent contractor as long as the "instance and expense" test was satisfied, the Court stated that "the purpose of the [1909 Act] is not to be frustrated by conceptualistic formulations of the employment [*sic*] relationship," *id.* at 1216, and concluded: "That [the song-writer] acted in the capacity of an independent contractor does not preclude a finding that the song was done for hire." *Id.* at 1217.

---

**13.** *Brattleboro* involved a somewhat unusual context for a dispute as to a commissioned work. Normally, the party claiming to have commissioned a work is a large entity that publishes numerous works and the party claiming to hold the renewal term is an individual who created the work. In *Brattleboro,* however, the individual advertising merchants commissioned the works, and the newspaper created them. This reversal of the usual roles might have influenced the outcome: the Court characterized the commissioning parties as "small merchants" who "were naive with respect to the complex provisions of the copyright law." *Brattleboro,* 369 F.2d at 568.

**14.** The Court's review of the earlier decisions can be viewed as somewhat overstating their language. First, the Court characterized *Brattleboro* as having "expressly applied the statutory work for hire doctrine to the case of an independent contractor." *Picture Music,* 457 F.2d at 1216. In fact, what *Brattleboro* had done was apply the "instance and expense" test to determine that a party commissioned to create a work should be deemed to have assigned its copyright for the original term to the commissioning party. *Brattleboro* never classified the work as a work for hire, although it did say that the work-for-hire "principles" were applicable to a commissioned work. Second, in *Picture Music,* the Court stated that *Yardley* "held that one who commissions an artist to paint a mural owns *all* rights to its reproduction." *Id.* (emphasis added). In fact, *Yardley* had recognized that the executor of the deceased artist, not the commissioning party, held the renewal right.

The Court's willingness to treat a commissioned work as a work for hire might have resulted from the way the case was presented on appeal. Although the appellant contended that the song was not a work for hire, its brief did not cite, much less discuss, the decisions in *Yardley, Vogel Music II*, or *Brattleboro*. After the decision in *Picture Music*, Professor Melville Nimmer entered the fray, filing a rehearing petition that discussed our earlier commissioned work decisions and reminded the Court that its prior decision in *Yardley* had left the renewal term in a commissioned work with the executor of the estate of the work's creator. Apparently, his argument came too late; the rehearing petition was denied without comment. *See Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213 (2d Cir.1972) (denying petition for rehearing). The Supreme Court also denied Prof. Nimmer's petition for certiorari, with only Justice Douglas dissenting. *Picture Music, Inc. v. Bourne, Inc.*, 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972).

By the time we next encountered a commissioned work, in 1995, *Picture Music* had carried the day, and we relied on it and its expansive reading of *Brattleboro* to hold that, as long as the "instance and expense" test is met, the work is a work for hire, and the party commissioning the work is regarded as the "author," entitled to all rights of copyright. *See Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 553–55 (2d Cir.1995).[15]

*Significance of* CCNV. Whatever questions might be raised about the law's progression in this Circuit from *Yardley* through *Picture Music*, we would normally be obliged to follow *Picture Music*, especially after its holding was reconfirmed in *Playboy*. We are given pause, however, by language in the Supreme Court's opinion in *CCNV*. *CCNV* concerned the work-for-hire provision of the 1976 Act. That Act defines a work for hire as:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for [any of nine specified uses] if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101. *CCNV* stated that to determine whether a work is a work for hire under the 1976 Act, "a court should first ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor" and then apply the appropriate subsection of the 1976 Act's definition. 490 U.S. at 750–51, 109 S.Ct. 2166. The Court rejected the contention that Congress, in enacting the 1976 Act, had intended to incorporate commissioned work cases decided under the 1909 Act such as *Picture Music* and *Brattleboro*, which the Court characterized as "holding that an employment relationship exists sufficient to give the hiring party copyright ownership whenever that party has the right to control or supervise the artist's work." *Id.* at 748, 109 S.Ct. 2166. Although ruling that the approach of these

---

**15.** *Playboy* acknowledged that "[u]ntil the mid–1960's, federal courts applied the work-for-hire doctrine only to cases in which a traditional employer/employee relationship existed between the hiring party and the creator of the work," 53 F.3d at 554, and cited the Ninth Circuit's decision in *Lin–Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir.1965), as the first case to apply the doctrine to a commissioned work. *Playboy*, 53 F.3d at 554. *Playboy* repeated the overstatement in *Picture Music* that *Brattleboro* had "held" that a party commissioning a work at its instance and expense is an "employer" for purposes of the 1909 Act. *Id. See* footnote 14, *supra*.

cases was not applicable to cases governed by the 1976 Act, the Court had no occasion to rule as to their continued viability for cases still governed by the 1909 Act.

However, in recounting the history of the work-for-hire doctrine under the 1909 Act, the Court explained that, as to commissioned works, courts of appeals "generally presumed that the commissioned party had impliedly agreed to convey the copyright, along with the work itself, to the hiring party." *Id.* at 744, 109 S.Ct. 2166. For this account, *CCNV* cited our decisions in *Yardley* and *Vogel Music II. Id.* By emphasizing our early cases' reliance on an implied *agreement* between the commissioning and the commissioned parties, this account could be read to confirm the view of *Vogel Music II* that a commissioned work is not a work for hire and to support an interpretation of *Yardley* that, upon the death of the commissioned party during the original term, the right to obtain the renewal term belongs to his executor (if no spouse or child survives) either because the renewal right was not impliedly assigned or, if impliedly assigned, such assignment is voided by his death before the vesting of the renewal term. The argument would be that, since with a true work for hire, copyright ownership and the right to obtain the renewal term are with the employer automatically upon the employee's creation of the work, the Court's reference to the commissioned party's implied agreement to convey the copyright reflects a view that the commissioning party does not have the right to obtain a renewal term if the creator dies before the term

vests. Interestingly, the Nimmer treatise takes this precise message from Justice Marshall's opinion in *CCNV. See Nimmer* § 9.03[D], at 9–28.4.[16] Our issue thus becomes whether to adhere to the clear holdings of *Picture Music* and *Playboy* or reject them on the basis of the language used in *CCNV* to describe our Court's earlier treatment of commissioned works under the 1909 Act.

■ Although the content of a Supreme Court opinion can provide a basis that permits us to reject a precedent of this Court without the need for in banc reconsideration, *see Gerosa v. Savasta & Co., Inc.,* 329 F.3d 317, 326–28 (2d Cir.2003) (circuit precedent rejected by panel because of reasoning in intervening Supreme Court opinion); *Boothe v. Hammock,* 605 F.2d 661, 663–64 (2d Cir.1979) (same), we conclude that the language in *CCNV* is an insufficient basis to warrant a panel's disregard of two clear holdings of this Court. *CCNV* was not concerned with the status of commissioned works under the 1909 Act. The language that mentions such works is a brief historical account. Indeed, in *Playboy,* our own Court acknowledged the same history, noting that "[u]ntil the mid–1960's, federal courts applied the works-for-hire doctrine only to cases in which a traditional employer/employee relationship existed between the hiring party and the creator of the work." 53 F.3d at 554. But, as we also noted in *Playboy, Lin-Brook Builders Hardware v. Gertler,* 352 F.2d 298, 300 (9th Cir.1965), became the first case to extend the work-for-hire doctrine to commissioned works. *Playboy,*

16. After quoting in italics the statement from *CCNV* recounting lower courts' use of an implied assignment theory as the basis for transfer of copyright by a commissioned party, the Nimmer treatise states:

The effect of the italicized sentence is that the hiring party owns a commissioned work created under the 1909 Act via assignment, not as its initial proprietor. The right to renew such a work, in the first instance, should therefore revert to that author rather than vesting automatically in the hiring party. To that extent, the holding of *Picture Music* becomes untenable.

3 *Nimmer* § 9.03[D], at 9–28.4.

53 F.3d at 554. After *Picture Music*, the doctrine was similarly extended in *Murray v. Gelderman*, 566 F.2d 1307, 1310 (5th Cir.1978), and *Real Estate Data, Inc. v. Sidwell Co.*, 907 F.2d 770, 773 (7th Cir. 1990). In sum, because we agree with Judge Gee's observation in *Easter Seal Society* that any distinction in the case law under the 1909 Act between employees and independent contractors "was erased long before the 1976 Act's arrival," *Easter Seal Society*, 815 F.2d at 330 n. 13, we conclude that the historical review in *CCNV*, if dictum at all, is dictum of a weak variety, and not grounds to relieve us from our obligation to follow *Picture Music* and *Playboy*.

The Hogarths' copyright claim therefore turns on whether they can successfully challenge either the District Court's ultimate conclusion that the Books were created at the "instance and expense" of ERB or the factual findings that underlie this conclusion.

■ *Application of the "instance and expense" test.* The Hogarths challenge to the District Court's conclusion that the Books were created at the "instance and expense" of ERB, as those terms have been used in this Circuit to determine copyright ownership of commissioned works, *see Playboy*, 53 F.3d at 553–56; *Picture Music*, 457 F.2d at 1216; *Brattleboro*, 369 F.2d at 567–68, is essentially a dispute about the facts. Judge Cote carefully considered the evidence and made precise findings to support her conclusion that the Books were created at the instance and expense of ERB. *See Dist. Ct. Op.* at *18–*24. We see no basis for disturbing her findings or her conclusions. Furthermore, as the District Court suggested, *id.* at *19, *24, the Books are derivative works based on original works for which ERB held the copyrights, and we ruled in *Picture Music* that in such

circumstances the copyright proprietor has the right to " 'direct and supervise' " the work of the commissioned party, sufficient to render it a work for hire, *Picture Music*, 457 F.2d at 1216 (quoting *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir. 1967)).

### B. Timeliness

The Hogarths contend that ERB is barred from claiming to be the author of the Books pursuant to the work-for-hire doctrine because of the statute of limitations, laches, and equitable estoppel.

*Statute of limitations.* Civil actions seeking copyright remedies are barred unless "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). "A cause of action accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised." *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir.1996). The Hogarths contend that ERB's "work-for-hire" claim is time-barred because it "accrued when [ERB] had notice of the contents of the copyright registration certificates identifying Hogarth as author of the Books in the 1970's." Brief for Appellants at 23–24.

■ The initial obstacle to the limitations defense is that ERB has not made a "claim" to which even a valid limitations defense could be asserted by the Hogarths. ERB did not file a counterclaim. As the issues were presented to the District Court for trial, ERB's work-for-hire contention was a defense to the Hogarths' claim for renewal rights. A defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations. *See United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 72, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) ("To use the statute of limitations to cut off the

consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation."); *Luckenbach Steamship Co. v. United States,* 312 F.2d 545, 548–51, 552 n. 3 (2d Cir.1963) ("The law is well settled that limitations do not normally run against a defense."); *133–24 Sanford Avenue Realty Corp. v. Cisneros,* 940 F.Supp. 83, 85 (S.D.N.Y.1996) ("It is well established that statutes of limitations run against affirmative claims for relief, but not against defenses."). Even if circumstances had existed when Watson–Guptill filed applications for registration in the 1970s that would have entitled ERB to seek a declaration of non-liability against a claim by Burne Hogarth, ERB would not have been obliged to seek such declaratory relief. Potential defendants are not required to seek at the earliest opportunity a declaration that a defense to a claim not yet brought is valid.

Arguably, ERB's inclusion, in the prayer for relief of its answer, of a request for a declaration that ERB owns all copyright rights in the Books functions as a counterclaim against which the Hogarths' limitation defense can be asserted. But the District Court apparently did not understand ERB to be asserting a counterclaim, and the judgment does not adjudicate one.[17] Moreover, even if ERB had filed a time-barred counterclaim, the statute of limitations would not have prevented ERB from asserting its affirmative defense to the Hogarths' claim. *See Delaware Chemicals, Inc. v. Reichhold Chemicals, Inc.,* 35 Del.Ch. 493, 503, 121 A.2d 913, 918 (1956) (dismissing counterclaims as time-barred but permitting counter-claimant to seek leave to amend to assert the counterclaims defensively).

■ We need not rest solely on the pleadings, however, because the limitations defense lacks merit. Contrary to the Hogarths' contention, ERB's claim to copyright interests in the Books did not accrue in the 1970s when the applications for registrations were filed. Even if the filing of an application for registration *by an adverse party* could start a limitations period, a matter we do not decide,[18] a party

---

**17.** The judgment denied the Hogarths' claim that Burne Hogarth is the sole author of the Books and denied their claim that they are successors to the copyright renewal terms. It did not make any declaration of ERB's rights.

**18.** Our Court has not decided whether a copyright ownership claim accrues solely upon an adverse party's filing of a registration reflecting ownership incompatible with that of the claimant. In *Merchant,* we upheld a jury's determination that a claim of co-authorship had accrued when the alleged co-authors reached the age of majority. 92 F.3d at 56. The critical circumstance bearing on accrual in *Merchant* was not that a certificate of registration, omitting the claimants as co-authors, had been issued prior to the claimants' reaching the age of majority; it was the claimants' knowledge that they were not receiving royalties to which they believed themselves entitled. *Id.* at 53 ("The jury also found ... that the only period during which Plaintiffs did

*not* know, and could not have known with the exercise of reasonable diligence, that royalties to which they were entitled had accrued lasted from 1955 to 1961, while Plaintiffs were underage.") (emphasis added). In *Stone v. Williams,* 970 F.2d 1043 (2d Cir.1992), we ruled that the claim of an author's daughter accrued when she was put on notice that "she might be the child of [a well known singer], and she knew then that she was receiving no money as a result of such relationship." *Id.* at 1049. As in *Merchant,* accrual occurred when the claimant became aware that she had sustained the injury of not receiving royalties. *Margo v. Weiss,* 213 F.3d 55 (2d Cir. 2000), likewise concluded that a co-authorship claim concerning a song written in 1961 accrued when the claimant knew or should have known of the grounds for the claim, *id.* at 60 (applying *Merchant* ). However, because the Court ruled that the plaintiffs knew of the grounds for their claim no later than 1992, *id.* at 61, more than three years before their complaint was filed in 1996, the Court

cannot be held to have started the limitations period for assertion of its copyright claims by filing its own applications for registration, no matter how erroneous. Recognizing that ERB's work-for-hire "claim" cannot accrue until it has suffered some injury, the Hogarths contended in the District Court that ERB suffered a "self-inflicted injury." *Dist. Ct. Op.* at *24. Not surprisingly, there is no authority for such a contention. The district court cases in which a claimant has been time-barred from asserting claims contrary to the information disclosed in a copyright registration involve applications for registrations filed by a party with interests adverse to those of the claimant. *See Carell v. Shubert Organization, Inc.,* 104 F.Supp.2d 236, 249 (S.D.N.Y.2000); *Willsea v. Theis,* No. 98 Civ. 6773(BSJ), 1999 WL 595629, at *5 (S.D.N.Y. Aug.6, 1999); *see also Netzer v. Continuity Graphic Associates, Inc.,* 963 F.Supp. 1308, 1315–16 (S.D.N.Y.1997) (copyright ownership claim accrued when claimant received comic book with copyright notice identifying adverse party as copyright proprietor).

■ In the pending case, as the District Court ruled, the injury to ERB "came at the earliest in 1999, when Hogarth's heirs asserted an undefined copyright claim in their letter to Disney." *Dist. Ct. Op.* at *24. The statute of limitations does not bar ERB from defending on the ground that the Books are works for hire.

■ *Laches and equitable estoppel.* The District Court correctly ruled that ERB is not barred from asserting its defense because of laches or equitable estoppel. *Id.* at *25. The Hogarths presented no evidence of reliance to their detriment arising from the registrations or from any other action taken by ERB. *See Ivani Contracting Corp. v. City of New York,* 103 F.3d 257, 259 (2d Cir.1997) (laches defense unavailable in absence of prejudice); *General Electric Capital Corp. v. Eva Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir.1994) (equitable estoppel requires, among other things, reliance on misrepresentations causing change of position by innocent party).

## C. Effect of Registrations

■ The Hogarths contend that the registrations for the Books that became effective in the 1970s created a presumption that Burne Hogarth was the author and that ERB has not overcome this presumption. Section 209 of the 1909 Act provides that the Register's certificate of registration "shall be admitted in any court as prima facie evidence of the facts stated therein." The 1973 application for registration of *Tarzan of the Apes,* filed by Watson–Guptill, identified the authors as "Edgar Rice Burroughs (deceased)" and "(illustrated) by Burne Hogarth." [19] The 1976 application for registration of *Jungle Tales of Tarzan,* also filed by Watson–Guptill, identified the author as "Burne Hogarth." ERB did not fully correct

---

must have thought that accrual could have occurred in 1992 by reason of events happening long after the plaintiffs made their alleged contribution to the song's creation.

19. Since Burroughs had died before the pictorial version of *Tarzan of the Apes* was created, he could not have been a co-author of any of the new material in this derivative work, and only such new material was entitled to a copyright. *See Durham Industries, Inc. v.*

*Tomy Corp.,* 630 F.2d 905, 909 & n. 6 (2d Cir.1980). The Register has noted that since the new matter is identified in the registration as "Burne Hogarth's pictorial version of Edgar Rice Burroughs' novel," the registration should be understood to have identified only Burne Hogarth as the author of the new matter and to have identified Edgar Rice Burroughs as the author of the underlying work. *Peters Letter* at 9.

these registrations until 1999, when it filed applications for supplemental registrations identifying ERB as author on the basis of work for hire.[20] In 2000, conflicting applications for registrations for the renewal term for *Tarzan of the Apes* were filed by ERB and by the Hogarths. ERB's initial renewal application listed "Edgar Rice Burroughs, Inc." as the author (on a work-for-hire theory), and the Hogarths' application listed Burne Hogarth as the author.

The application forms on which Watson–Guptill applied for registration of a copyright for both of the Books stated: "Where a work was made for hire, the employer is the author." The Hogarths contend that, in light of this explicit instruction, the omission of ERB as "author" on the applications filed by Watson–Guptill resulted in registration certificates in effect "disclaiming 'employer for hire' status for ERB." [21] Brief for Appellants at 36.

As the Register's letter to this Court explains, however, the Copyright Office's examination of copyright applications is "necessarily limited," *Peters Letter* at 4, and should be "distinguished from the Patent and Trademark Office's process for issuance of patents," *id.* at 3–4. "[T]he Office does not make factual determinations with respect to publication or any

other act done outside of the Office" and "will register adverse claims by more than one party," *id.* at 4, which are "not unusual," *id.* at 14. Commenting on ERB's application for supplementary registration, filed in 1999, which identified ERB as the author of *Tarzan of the Apes* on a work-for-hire theory, the Register's letter also points out that it is not unusual for correcting information to be submitted at any time during the original term. *Peters Letter* at 10.

The Register's letter specifically endorses the following passage from Judge Cote's opinion concerning the significance of the registrations:

"[A] certificate of registration creates no irrebuttable presumption of copyright validity. Extending a presumption of validity to a certificate of copyright merely orders the burdens of proof." *Carol Barnhart, Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 414 (2d Cir.1985) (citations omitted). Furthermore, "where other evidence in the record casts doubt on the question, validity will not be assumed." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980).

*Peters Letter* at 22 (quoting *Dist. Ct. Op.* at *17). "Thus," the Register concludes,

---

**20.** The 1976 Act provides that "the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence ... of the facts stated in the certificate" and that "[t]he evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c).

**21.** ERB seeks to minimize the significance of the listing of Burne Hogarth as co-author or author of the Books by pointing out that the Register's instructions applicable to registrations for the *renewal term* under the 1909 Act state, "The term 'author' does not include employers for hire." Letter of Roger L. Zis-

su, Esq., to Roseann B. MacKechnie, Clerk, U.S. Court of Appeals for the Second Circuit (May 1, 2003) (enclosing *Compendium of Copyright Practices, Compendium I* § 11.7.1(II)(a)). ERB argues that including an employer as an author in the case of a work for hire under the 1909 Act and not including such an employer as an author for purposes of the renewal term creates an "inconsistency" that "illustrates the difficulty for a lay person, or even a lawyer, in preparing applications and understanding the evolving work for hire doctrine." *Id.* We are not persuaded that lawyers are entitled to be so easily confused between a provision concerning the original term and one concerning the renewal term.

"all that the statutory presumptions flowing from the certificates of registration do is to shift the burden of going forward." *Id.* at 23. We agree.[22] *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 111 (2d Cir.1998).

In the pending case, ERB has adequately discharged its burden of rebutting the presumption to be accorded the facts reflected in the original registrations. On the facts as found by the District Court and under this Circuit's case law applicable to those facts, the Books are works for hire. ERB is legally regarded as the "author" entitled to both the original and the renewal terms.[23]

We acknowledge that we are disturbed that a corporation as sophisticated in the protection of its copyrights as ERB did not correct the registrations for the Books to identify them as works for hire until 26 and 23 years, respectively, after the initial registrations. It is even more perplexing that Marion Burroughs, an officer of ERB and the daughter-in-law of Edgar Rice Burroughs, would file an application for a supplementary registration for *Tarzan of the Apes* in 1979 that only corrected the misspelling "Edgard" and added Edgar Rice Burroughs as author of original text, but left Burne Hogarth identified as the author of the work with no indication that ERB claimed to be the proprietor of a

work for hire. However, as we noted in rejecting the Hogarths' laches contention, there is no evidence of prejudicial reliance by Burne Hogarth or his heirs on the lack of work-for-hire identification before 1999, nor is there any basis for rejecting the District Court's well supported conclusion that the Books are works for hire.[24]

## II. Contract Claims

The Hogarths' two contract claims merit no discussion beyond the analysis provided by the District Court. Concerning the claim for a portion of the payment ERB received from Disney, Judge Cote properly concluded that ERB did not license to Disney any rights in the copyrightable material in the Books, *Dist. Ct. Op.* at *25–*27, and that, even if that had occurred, the 1970 Agreement gave Burne Hogarth no entitlement to any portion of the Disney payments, *id.* at *28–*29. As to the claim that ERB's failure to build a museum to house the Tarzan artwork breached the 1970 Agreement and entitled the Hogarths to return of the original artwork for the 1972 book, Judge Cote properly concluded that ERB was not obligated to build the museum, and that the artwork had been correctly distributed pursuant to the 1970 Agreement. *Id.* at *29.

---

**22.** Although "'the Copyright Office has no authority to give opinions or define legal terms,'" *Morris v. Business Concepts, Inc.,* 283 F.3d 502, 505 (2d Cir.2002) (quoting *Bartok v. Boosey & Hawkes, Inc.,* 523 F.2d 941, 946–47 (2d Cir.1975)), we have sometimes found the Office's views "persuasive," *id.*

**23.** ERB's evidence also sufficed to rebut whatever presumption arose from the Hogarth's renewal term application for *Tarzan of the Apes,* even if that presumption was not already dissipated by the filing of ERB's conflicting renewal term application. *See Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary*

*Dance, Inc.,* 224 F.Supp.2d 567, 586–87 (S.D.N.Y.2002); *NBC Subsidiary, Inc. v. Broadcast Information Services, Inc.,* 717 F.Supp. 1449, 1451 (D.Colo.1988).

**24.** Perhaps, in considering the registrations for the Books, Burne Hogarth shared the view expressed by counsel for the Hogarths during this litigation that, when confronted with the original term registrations for the Hogarth comic strips, which are conceded to be works for hire yet identified Hogarth as "author," he inferred that the word "author" was being used, not as a "legal conclusion," but "colloquially."

168

### Conclusion

The judgment of the District Court is affirmed. Although, as we have noted, the incorrect identification of the author in the original registrations and ERB's long delay in correcting those registrations are not grounds for disturbing the District Court's judgment, we observe that had ERB been more attentive to the filings made on its behalf, this litigation would in all likelihood have been avoided or at least substantially reduced in scope. We therefore exercise our discretion to deny ERB an award of appellate costs. *See* Fed. R.App. P. 39(a) (cost provisions apply unless court "orders otherwise").