BLUE PLANET SOFTWARE, INC.
and Alexey L. Pajitnov,
Plaintiffs,

v.

GAMES INTERNATIONAL, LLC
and Elorg Company, LLC
Defendants.

No. 03 CIV.8904 SHS.

United States District Court,
S.D. New York.

Sept. 7, 2004.

See also 2004 WL 1907757.

John J. Kirby, Jr., Latham & Watkins, New York City, for Plaintiffs.

Glenn D. Bellamy, Greenebaum Doll & McDonald PLLC, Cincinnati, OH, Steven A. Smith, Mark Norman Mutterperl, Fulbright & Jaworski, L.L.P., New York City, for Defendants.

*OPINION and ORDER*

STEIN, District Judge.

## INTRODUCTION

In this action arising over the intellectual property rights to the popular video game *Tetris,* the parties have brought cross-motions for preliminary injunctions to enjoin the other from interfering in the movant's purported ownership rights to *Tetris* until the dispute over those rights is resolved. Specifically, all parties agree that the intellectual property associated with *Tetris* is suffering irreparable harm; yet each of the parties asserts that they are both likely to succeed on the merits or that they have raised serious questions as to the merits to make them fair ground for litigation and a balance of the hardships tips decidedly in their favor. For the reasons set forth below, including this Court's finding that the assignment of rights, and the documents supporting that assignment, are ambiguous, plaintiffs' motion for a preliminary injunction is denied and defendants' motion for a preliminary injunction is granted in part and denied in part.

## DISCUSSION

### I. Factual Background: The Tetris Story

The *Tetris* story swells with contradictory tales that describe the scope of unrecorded grants of intellectual property rights, and conflicting writings that inconsistently memorialize those grants. Yet the ultimate question for this Court's resolution is straightforward: who now owns the intellectual property rights to *Tetris?*

While employed by the Computer Center of the Academy of Sciences of the U.S.S.R. ("CCAS"), plaintiff Alexey Pajitnov created, named, and developed *Tetris* in 1984 and 1985, now recognized as one of the most popular video games in the world "in which the goal is to manipulate seven geometric shapes and fit them together to form solid lines of blocks as they 'fall' from the top of the video screen." (Pajitnov Decl. ¶ 2, 4–6). As *Tetris* gained in popularity globally, Pajitnov, as a citizen of the U.S.S.R., was unable to benefit commercially from his creation, but had the option to allow the Soviet government to exploit it. (*Id.* ¶ 7). Pajitnov did just that in 1986 by making at least one grant of his rights to the Soviet government. The govern-

ment agency to which Pajitnov assigned the rights to *Tetris* was the CCAS, his employer. (*Id.* ¶ 8). The almost mysterious scope of that assignment is a central issue in this case to be discussed at length *infra;* still, the dispute may be succinctly described: plaintiffs assert that the grant was limited to ten years expiring at the end of 1995, while defendants argue that Pajitnov in fact granted his rights to *Tetris* in perpetuity.

Following that initial assignment of rights to CCAS, the same Computer Center then assigned its rights (whatever rights Pajitnov had in fact granted) to the then export agency of the Soviet Union, V/O Electronorgtechnica ("Soviet Elorg"), to enable Soviet Elorg to act as CCAS's licensing agent for transactions abroad. (Pajitnov Decl. ¶ 2, 8). Defendants assert that they are the successors-in-interest of Soviet Elorg; defendants also independently claim they are the assignees of the *Tetris* intellectual property rights of Soviet Elorg, irrespective of their status as successors-in-interest.

After the authorization to Soviet Elorg to handle international licenses, Soviet Elorg granted Nintendo Entertainment Systems ("Nintendo") in March 1989 an exclusive worldwide license for five years (plus a one-year extension option) to produce and distribute the *Tetris* program on Nintendo and other home video game systems. *See Tengen, Inc. v. Nintendo Co., Ltd.,* Civil Action No. C–89–1334 FMS (N.D.Cal.); (Defs' Mem. Supp. Prelim. Inj. ("Defs' Mem. Supp.") at Ex. 4, ¶¶ 10.1—10.2). As part of the agreement between Nintendo and Soviet Elorg, Nintendo was required to file U.S. trademark and copyright registrations for the *Tetris* game "in the name of Soviet Elorg." (Nagae Decl. ¶ 6; Defs' Mem. Supp. Ex. 4 ¶ 8.3).

The current dispute began to manifest itself toward the end of Nintendo's license term which approximately coincided with the expiration of the alleged overall ten-year limit on the original grant as claimed by Pajitnov. As the expiration of the Nintendo license and the underlying alleged ten-year limit drew near, both Pajitnov and Soviet Elorg prepared to retake control over the *Tetris* property rights in accordance with their respective views on the duration of the original grant by Pajitnov.

Pajitnov entered into an exclusive licensing agreement with Henk Rogers' Japanese Company, Bullet–Proof Software, to take effect after the expiration of the ten-year period at the end of 1995; meanwhile, Soviet Elorg continued to assert its prospective rights after the same time. In an apparent resolution of the conflicting claims, Rogers and Nikolai Belikov, an officer of Soviet Elorg, reached an agreement aimed at resolving the dispute. (Pls' Mem. Supp. Prelim. Inj. ("Pl's Mem. Supp.") at 9–10; Rogers Decl ¶ 11; Pajitnov Decl. ¶ 19). Rather than litigate, Pajitnov and Rogers agreed with Belikov to create a new company that would possess the respective ownership rights that each party contended they possessed. (*Id.*). That new company was called The Tetris Company, L.L.C. ("TTC"), governed by the Limited Liability Company Agreement of The Tetris Company, L.L.C. ("TTC Agreement"). (Defs' Mem. Supp. Ex. 14). The TTC Agreement provides, inter alia, that if any member elects to withdraw, the remaining member or members "shall have the option of either dissolving the Company or purchasing . . . the withdrawing Member's Interest." (*Id.* ¶ 12.1).

In order to form this new company, each side created new corporate entities through which it would control the shared company: Rogers created Blue Planet Software, Inc. ("BPS") and the rights that

Pajitnov had granted to Rogers were further transferred to BPS, and Belikov formed defendant Elorg L.L.C. of Delaware ("Elorg USA") and Games International, Inc. ("Games"). (Rogers Decl. ¶ 11, Pajitnov Decl. ¶ 19). In turn, Pajitnov—through BPS—joined with Elorg USA—through Games—to form TTC "as a mechanism to exploit *Tetris* and share the licensing revenues from *Tetris*." (Rogers Decl. ¶ 11). Each side maintained a 50% interest. (*Id.*).

Though the parties agree upon the facts surrounding the formation of TTC, they maintain opposing views of what role each side played as part owners. Rogers contends that BPS "almost exclusively" performed all quality assurance, game design, and research and development. (Rogers Decl. ¶ 12). Yet defendants maintain that Elorg was "solely responsible for quality control of the products sold by Nintendo." (Defs' Mem. Supp. Prelim. Inj. at 3, Ex. 4 ¶ 3.2). Ultimately, the mutual arrangement failed; BPS withdrew from TTC pursuant to the TTC Agreement because of conditions "detrimental to BPS and Mr. Pajitnov and detrimental to the preservation of the *Tetris* name and mark ...." (*Id.*, Ex. 13, 14; Rogers Decl. ¶ 14–15).

Subsequent to BPS's withdrawal, each side allegedly acted in a manner that its adversaries contend is now causing the *Tetris* mark irreparable harm. On the one hand, plaintiffs assert that "Games has recently contacted virtually all of the companies that have licensed rights to *Tetris* and wrongly asserted that Mr. Pajitnov has no right, title, and interest in the *Tetris* game or mark and that BPS has no rights to license the *Tetris* game or mark ..." and that such actions "are causing confusion among the *Tetris* licensees and damage to the *Tetris* intellectual property." (Rogers Decl. ¶ 16). Additionally, TTC sent a letter to one licensee stating that "you deal with Henk Rogers/Blue Planet Software at your own risk." (*Id.* Ex. E). Plaintiffs further assert that defendants' actions have "cast a substantial cloud on title to the property," alleging significant economic harm including threats to terminate and actual terminations of licensing deals for *Tetris* specifically "due to the dispute over the ownership of *Tetris* between Games and BPS ..." and the inability to negotiate new licensing deals for *Tetris*. (*Id.* at ¶¶ 21–25).

On the other hand, defendants claim that BPS interfered with their claimed rights. Defendants point out that BPS sent out letters to *Tetris* licensees informing them that TTC is being dissolved and that "[i]n the future you may license the Tetris trademark and copyright from Blue Planet Software, Inc" and that Pajitnov "is the rightful owner of all 'Tetris' copyrights and trademarks." (Defs' Memo. Supp. Ex. 15). After TTC responded to BPS' first letter to *Tetris* licensees, BPS sent out another letter to the licensees rebutting TTC's statements and affirming BPS's rights to *Tetris*. (*Id.* Ex. 18). Moreover, defendants allege that plaintiffs have distributed copies of the Complaint in this action to the licensees, which defendants contend violates the confidentiality provision of the TTC Agreement. (*Id.* Ex. 14 ¶ 14.3).

The parties remain bitterly at odds as to who is the rightful owner of the *Tetris* intellectual property rights. Yet all agree that the *Tetris* rights are suffering irreparable harm and that a resolution is required. (Pls' Letter to the Court on June 25, 2004; Defs' Letter to the Court on June 28, 2004).

## II. Legal Standard

■ A party moving for a preliminary injunction must show " '(1) irreparable

harm in the absence of the injunction[1] and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir.2004) (quoting *Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir.2002)). This standard applies for matters involving trademarks, *see, e.g., Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 24 (2nd Cir. 2004) and copyrights, *see, e.g., MyWebGrocer*, 375 F.3d at 192–93.

## III. The Assignment and The Conflicting Document Trail

### A. *The Assignment of Rights*

In 1986, sometime after the creation of *Tetris*, Pajitnov assigned—perhaps through more than one grant—the intellectual property rights to *Tetris* to his employer CCAS for a certain time period, the length of which the parties contest. As noted above, the issue is whether that grant of rights was for only ten years—as plaintiffs contend—or were they granted in perpetuity—as defendants contend. Four categories of documents form the paper trail that postdates and refers to this illusive grant: (1) subsequent affirmations by parties to that grant confirming its substance, (2) contractual agreements between parties that either directly or collaterally reference the scope of the grant (3) subsequent letters from parties referring to the substance of the grant, and (4) subsequent copyright and trademark registrations to which the law attaches presumptions of ownership.

### B. *The Conflicting Affirmations, Agreements, and Letters*

The spate of affirmations, agreements, and letters—with their conflicting terms— are best analyzed only after the text of each is fully set forth for ease of comparison.

#### 1. The Documents

The earliest document—Pajitnov's "Affirmation By the Creator and Author of the Game 'TETRIS'" signed by the same on March 17, 1989 ("the March 1989 Affirmation")—offers the initial instance in which a party memorialized the assignment of rights at issue. (Pajitnov Decl. Ex. A)[2]. The final paragraph of the March 1989 Affirmation states:

> I [Pajitnov] *confirm that I granted* the Computer Center of the USSR Academy of Sciences the exclusive rights in the Game Tetris including the trademark, all copyright and other rights *(with the sole exclusion-the right to use the trademark Tetris for products not related to the game)* in the beginning of 1986 *for a period of 10 years.* On the basis of this grant of rights, the Computer Center of the USSR Academy of Sciences, in conformity with the Soviet Legislation in force, legally is *the owner* of the right and license for selling the program product—the Game Tetris on the world market.

(*Id.*) (emphases added). Besides the obvious limitation in time affirmed to have been placed upon the grant, at least two other features become relevant in this action that will later be discussed in depth. First, "merchandising rights"—as the par-

---

1. The parties agree that this prong is satisfied—that the *Tetris* rights are suffering irreparable harm—though each side believes it is the one that endures the harm.

2. Games confirmed in 2003 that this Affirmation is "genuine." (Rogers Decl. Ex. B).

ties refer to the right to use the *Tetris* trademark in connection with other "products not related to the game"—were affirmed to have been explicitly excluded from the grant. Second, this document presents the first piece of evidence illuminating the parties' intent as to the meaning of the term "owner" as used in their course of dealing. That meaning—from an internal analysis of this document alone—appears to be different than the most common meaning of an owner—someone in possession for perpetuity—because the document confirms the CCAS as "the owner" despite only confirming a grant of ten years. Every subsequent document need be viewed in light of this ten year time span that began in 1986.

Five days after that affirmation, Soviet Elorg entered into the contract with Nintendo ("the Nintendo License") to license to Nintendo for five years "the exclusive rights to manufacture, market, distribute, sell, and sub-license the Game all over the world for play on Home Video Game Systems." (Defs' Memo. Supp. Ex. 4, Preamble ¶ 3). Signed on March 22, 1989 by representatives of Soviet Elorg, Nintendo, and the CCAS, *as well as by Pajitnov*, it set forth that Soviet Elorg as "Licensor" *"has all exclusive rights* to the game ... its program or software, its design script and its audiovisual work, including but not limited to copyrights, trademarks and other related rights in said Game." (*Id.* ¶ 2) (emphasis added).

Roughly one month later—on April 20, 1989—Belikov, as an officer of Soviet Elorg, swore via an annexed declaration to the truth of a letter addressed to John J. Kirby, then counsel for Nintendo and counsel for plaintiffs on these motions for preliminary injunctions.[3] (Pajitnov Decl. Ex. C). In that letter, Belikov writes in relevant part:

> [Pajitnov] granted his employer, the [CCAS], the exclusive rights in the Tetris game, including all trademarks, copyrights and other rights, in early 1986 *for a period of 10 years.* The sole exception to this grant of rights was the right to use the Tetris trademark [merchandising]. In early 1987 the [CCAS] authorized Elorg to represent it in licensing Tetris on the world market.

(*Id.* at 1) (emphasis added). Belikov concluded the letter: "This letter is complitely [sic] truthful and absolutely correct." (*Id.* at 4). At some point probably in 1989[4], the Director of CCAS wrote a letter to Belikov stating that the CCAS is "the owner of the exclusive rights and licenses" for *Tetris* and that Soviet Elorg is its agent. (Martin Decl. Ex. 3, ¶ 1). Comparing those two documents, it becomes evident that Belikov subsequently described the scope of the grant differently from what the CCAS Director has stated; i.e., Belikov in April of 1989 confined the grant to ten years even though the letter he received simply stated that CCAS was "the owner."

Some seven months after the ink on the March 1989 Affirmation had dried, Pajitnov and a representative of the CCAS co-signed an "Assignment Agreement" on October 16, 1989 ("the Merchandising Assignment") in which Pajitnov assigned to the CCAS the merchandising rights previously excluded from the March 1989 Affirmation.

---

3. In an Opinion and Order dated August 25, 2004, this Court granted defendants' motion to disqualify plaintiffs' counsel. These motions for preliminary injunction had been made prior to that determination.

4. Though no date is discernable from the document, it must have been signed before Belikov authored his letter on April 19, 1989, but after 1987, a year referenced in the letter to Belikov.

(*Id.* Ex. 5). The Merchandising Assignment states in relevant part:

> [F]or sufficient, good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows: ... Assignor [Pajitnov] does hereby sell, assign, and transfer to Assignee [CCAS] all of his merchandising rights to the personal computer, hand-held, arcade and home video game versions of Tetris as well as the merchandising rights in associated programs and software, design scripts, visual and auditory representations, symbols, designs, copyrights, trademarks and art work ...

(*Id.*). This latter document differs from the March 1989 Affirmation in two fundamental ways. First, unlike the March 1989 Affirmation, the October 1989 Assignment was constructed as an operative legal document—an assignment of rights—rather than an affirmation that a prior assignment took place. Second, only merchandising rights are addressed and no time limit is set forth.

Approximately one year after signing the March 1989 Affirmation, Pajitnov issued a second affirmation—titled "Affirmation of Game 'TETRIS'" signed on March 11, 1990 ("the March 1990 Affirmation")—in which he "confirm[ed]" CCAS's ownership in the rights to *Tetris,* albeit this time without an explicit time limitation of ten years or otherwise. (*Id.* Ex. 7). In the March 1990 Affirmation, Pajitnov stated:

> I, [Pajitnov], the author and creator of Game "TETRIS" ("Game"), should like to confirm that the [CCAS], to which I belong, is *the owner* of the exclusive rights and licensees for the Game, including the trademark, copyrights and all other rights in said Game. I should like to further confirm that [Soviet Elorg] was granted all the exclusive rights *to represent* the interests of the [CCAS] regardind [sic] the Game on the international markets and any other Soviet organizations except Elorg do not had [sic] said rights in the USSR.

(*Id.*) (emphasis added).

Separately from the affirmations and agreement set forth above, the Director of the CCAS *alone* signed a separate affirmation in 1990 confirming CCAS's purported ownership rights in *Tetris* and setting forth Soviet Elorg's role as the agent for CCAS. That affirmation stated in relevant part:

> [T]he [CCAS] is the owner of the exclusive rights and licenses for the game "TETRIS", ("GAME"), including the trademark, copyright and all other rights in said Game. The Game was created in our Center by our staff member of the Computer Center, [Pajitnov] in 1985. In the beginning of 1987, the [CCAS] authorized [Soviet Elorg] to introduce the Game "TETRIS" in the world market, acting in our interest, and we have given them all necessary proxy.

Crucial to placing this document in context with the others is that this document was issued while the ten year period in the March 1989 Affirmation was still running.

Finally, defendants cite to an order by U.S. District Judge Fern M. Smith for the proposition that Pajitnov transferred all of his rights to *Tetris* without any time limit. *See Tengen, Inc. v. Nintendo of America, Inc.,* Order Granting Partial Summary Judgment, No. C–89–1334, 1989 WL 201201 (N.D.Cal.1989). Judge Smith wrote that Pajitnov "transferred all of his rights in the program to [Soviet Elorg] which became responsible for negotiating the sale of distribution rights to the program." *Id.* at *1. Yet that order focused on an unrelated issue and made only a passing reference to the transfer of rights; accordingly, this Court finds that order to not control the issue at bar.

## 2. Analysis

What becomes clear from the documents set forth above is that the record of and references to the grant of rights is collectively anything but clear. Most obviously, the scope of the grant remains uncertain. Additionally, the mode by which the grant was made—orally or by writing—is as elusive as its intended scope. Moreover, the record fails to indicate whether only one grant was made, and was simply recorded or referenced inconsistently, or whether a differing superceding grant was made subsequent to the initial grant, and the parties failed to memorialize the fact that a latter grant replaced the former[5]. Ultimately, the parties' intent is ambiguous and this Court turns to the fundamentals of contract law.

■ An assignee generally may not acquire more rights than were possessed by the assignor and "simply stands in the shoes of the assignor." *See Furlong v. Shalala,* 156 F.3d 384, 392 (2d Cir.1998); 6 Am.Jur.2d Assignments §§ 118, 145. With that background in mind, well-recognized principles addressing ambiguous language in contracts provide the necessary legal framework within which to analyze this action.

■ It is well settled that "the primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993) (quoting *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992)). Moreover, it is axiomatic that where the language of the contract is clear and unambiguous, the parties' intent is to

be determined from the four corners of the document without consulting extrinsic evidence. *See Feifer v. Prudential Ins. Co. of America,* 306 F.3d 1202, 1210 (2d Cir.2002) (citing *United States v. Liranzo,* 944 F.2d 73, 77 (2d Cir.1991)). However, where the agreement contains ambiguous language, evidence external to the contract may be offered by the parties in an effort to resolve the ambiguity in their favor. *See Kerin v. U.S. Postal Service,* 116 F.3d 988, 992 n. 2 (2d Cir.1997).

■ Determining whether contractual language is ambiguous presents a question of law for the trial court. *See Sayers* 7 F.3d at 1094. Contractual language is deemed ambiguous when it is

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

*Id.* at 1095 (quoting *Walk-in Medical Centers, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987)). Moreover, "a contract may be ambiguous when applied to one set of facts but not another." *Eternity Global Master Fund Lmtd. v. Morgan Guaranty Trust Co. of NY,* No. 03 Civ. 7652, 2004 WL 1534169 (2d Cir.2004) (quoting *World Trade Ctr. Props. L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 184 (2d Cir.2003)).

### a. Insofar As All Rights Are Concerned, Excluding Merchandising Rights, The Term "Owner" Is Ambiguous

■ No singular document exists that evidences the grant or grants of rights. Rather, the rights to *Tetris* were assigned

---

5. Games apparently has taken the position that the October 1989 Assignment is a superceding assignment that includes "all rights, copyrights, trademark, and merchandising rights, without limitation to time." (Rogers Decl. Ex. B).

at some point in 1986 and other documents merely refer to that grant, some by explicit intent and some by indirect reference. An examination of these documents, set forth above, reveals that the term "owner" as used by the parties is ambiguous as to its intended meaning. "Owner" is defined as "one that owns" and "one that has the legal or rightful title whether the possessor or not." *Webster's Third New International Dictionary* 1613 (1993). This definition is silent as to the temporal aspect of ownership and it remains unclear whether the parties intended "owner" to incorporate an understanding as to time.

The March 1989 Affirmation by Pajitnov sets the ambiguous tone for all subsequent documents that refer to the grant. That affirmation is itself internally ambiguous. On the one hand, plaintiffs argue that "owner" connotes only a present ownership, rather than absolute possessory rights, because Pajitnov states in that document both that he grants CCAS the exclusive rights simply "for a period of 10 years" and that CCAS is "legally . . . the owner." (Pajitnov Decl. Ex. A). Accordingly, "owner"—plaintiffs reasonably contend—could only connote present possession; otherwise, the document would be internally inconsistent and that is an unlikely scenario.

Moreover, plaintiffs posit that the other documents support their understanding of the grant. They contend that the Nintendo Agreement only refers to present rights, and in any event, does not convey any ownership rights because that agreement is not an operative document between Pajitnov and another party. Additionally, plaintiffs emphasize that Belikov's letter referring to the ten-year limit expressly corroborates Pajitnov's March 1989 Affirmation that confirms the limit on the grant. As for Pajitnov's March 1990 Affirmation, despite its lack of a time limi-

tation, plaintiffs urge that the term "owner" must be read in the context of the earlier affirmation to connote only present ownership and that the holder of a ten year license was considered an "owner" under Soviet legal principles. (Pls' Mem. Supp. at 19–20). Plaintiffs maintain similar arguments as they address the other documents set forth above and broadly argue that "[d]efendants' motion, and this entire case, hinges on whether Defendants have proven that Mr. Pajitnov, sometime after September 1989, gave away all of his right in his creation, for no reason and without compensation." (Pls' Mem. Opp. Prelim. Inj. at 2).

On the other hand, while defendants would have a difficult task arguing that "owner" meant more than an ownership for some limited time period if just viewing the March 1989 Affirmation, defendants reasonably maintain that "owner" connotes perpetual ownership when analyzed in the context of the entire relationship of the parties. In particular, defendants argue that plaintiffs' case "hinge[s] on one thing: a single writing, made three-years after-the-fact, internally ambiguous, recalling an oral limitation, that is contradicted by each and every subsequent writing, at least three of which were signed by Mr. Pajitnov." (Defs' Reply Mem. Supp. Prelim. Inj. at 9–10). Defendants claim that the grant may have changed at one point, that subsequent records reflect this change, and that those later documents should be controlling because they embody the most recent agreement between the parties. However, this last point cannot be determinative at this stage because it remains ambiguous whether there was in fact a later agreement—plaintiffs' interpretation of the evidence rejects that possibility.

Ultimately, each side finds some support for its reasonable and respective ownership claims. For this very reason, the

scope of ownership rights (except for the merchandising rights) conveyed by the actual grant is ambiguous as a matter of law. *See Sayers,* 7 F.3d at 1094. Accordingly, it cannot be said at this point in the litigation that either side is likely to succeed on the merits based upon its respective ownership claim for the non-merchandising rights.

b. Merchandising Rights

The Merchandising Agreement, and the corresponding merchandising rights for *Tetris,* present a situation quite different than the copyright and trademark rights for several reasons. First, whereas many of the prior documents only confirm or reference a transfer of non-merchandising rights, the Merchandising Agreement purports to actually "sell, assign, and transfer" the merchandising rights from Pajitnov to the CCAS. (Defs' Mem. Supp. Ex. 5). Its title—"Assignment Agreement"—reflects its nature. In fact, it appears to be the only operative document that actually conveys rights from Pajitnov to another party.

Second, the term "owner," ambiguous in the context of these parties' dealings, does not appear in the Merchandising Agreement. Nor is any other ambiguity present. Because the merchandising rights were expressly excluded in the other documents set forth above, the parties apparently considered these rights separately from the transfer of all the other rights.

Accordingly, this Court will not look beyond the plain and unambiguous language of this agreement. Though plaintiffs stress that Pajitnov understood the transfer of rights to take place within the context of the ten year limit confirmed months earlier, that parol evidence would most likely be inadmissible at trial to refute the plain terms of the contract. As such, defendants have shown a likelihood of success as to their ownership claim for the merchandising rights and their preliminary injunction shall be granted insofar as those rights are concerned.

C. **_The Copyright and Trademark Registrations_**

1. Statutory Presumptions and Evidence of Ownership

In connection with its obligations pursuant to the Nintendo Agreement, Nintendo filed U.S. trademark and copyright registrations for the *Tetris* trademark and video game in the name of Soviet Elorg[6]. (Nagae Decl. ¶¶ 5–7). Defendants put forth substantial effort detailing and place heavy reliance upon the legal presumption of ownership afforded the registrant of copyright and trademark registrations. Defendants stress that their status as registrants for the *Tetris* copyrights and trademarks signifies that they are the presumed owner, and in the instance of one trademark the conclusive owner, arguing that these presumptions thereby entitle them to a preliminary injunction. However, the law sets forth merely a presumption of ownership, which is rebuttable even in the case of an "incontestable" registration. Rather, plaintiffs place at bar several arguments which require a more focused analysis than a simple reliance upon a statutory presumption to yield a dispositive answer.

In particular, defendants correctly assert that the fact that they have registered

---

**6.** By registering those rights in Soviet Elorg's name, one of the attorneys responsible for submitting the registration documents states that his firm did not "intend to represent that Soviet Elorg had any rights in the Tetris trademark or copyrights beyond those described [in two documents—one by Pajitnov and one by Belikov—that each limit Pajitnov's grant of rights to ten years]." (Nagae Decl. ¶¶ 8–10).

the *Tetris* trademarks and copyrights in their name provides prima facie evidence as to the ownership of those rights. A registration of a trademark

> shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce ... but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered.

15 U.S.C. § 1115(a). As set forth in section 1115(a), legal and equitable defenses are available to rebut a prima facie showing of ownership.

Moreover, the right of the registrant to use the trademark shall become "incontestable" when the mark "has been in continuous use for five consecutive years" after the date of registration and is still being used in commerce. 15 U.S.C. § 1065. An incontestable mark shall be "conclusive evidence" of its validity and the registrant's ownership. 15 U.S.C. § 1115(a). Despite what the name suggests, "incontestable" status is subject to several defenses as set forth in section 1115(a).

In addition, copyright law provides a similar presumption, though does not offer a parallel "incontestable" status. For copyrights, the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court. 17 U.S.C. § 410(c). Though no defenses are set forth in section 410 to rebut the presumption of ownership for copyrights, the Second Circuit has made clear that the validity of the facts in the registration too may be rebutted " 'where other evidence in the record casts doubt on the question ....' " *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166–67 (2d Cir.2003) (quoting *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980)).

Despite the presumptions of ownership that attach to copyright and trademark registrations, plaintiffs successfully retort with several distinct points.[7]

a. The Mere Registration Of A Trademark Or Copyright Does Not Create Property Rights

■ First, while registrations may be prima facie evidence of ownership, the mere fact that a party registers its copyrights or trademark rights does not create substantive ownership rights in the registrant. Rather, substantive copyrights spring to life at the moment of the genesis of the creative work and attach to the creator or author immediately, *see Harper*

---

7. Building upon these statutory presumptions, defendants argue the additional point that insofar as the copyrights are concerned, only the author or the author's assignee may be identified on a registration, and never a licensee. Accordingly, defendants reason that the fact that they are listed on the registration is further evidence that they are the assignee of the copyrights and not just licensees. However, as plaintiffs correctly point out, a licensee being listed as a claimant or owner may be a technical error, but in any event, a party does not acquire ownership merely by virtue of having been listed as the claimant or owner. Plaintiffs' argument is further supported by the fact that the attorney responsible for those registrations has stated that he and his firm did not "intend[ ] to represent that Soviet Elorg had any rights" to *Tetris* beyond the ten-year limit. (Nagae Decl. ¶ 8–10).

& Row, Publishers, Inc.v. Nation Enterprises, 471 U.S. 539, 546–47, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), and similarly, trademark rights attach based upon use of the mark in commerce and registration provides no additional substantive rights against infringement beyond acquired common law rights, see Time, Inc. v. Petersen Pub. Co. L.L.C., 173 F.3d 113, 118 (2d Cir.1999) (citing La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc., 495 F.2d 1265, 1270 n. 5 (2d Cir. 1974)).

Accordingly, registrations merely offer evidence of ownership, and that showing need not be dispositive of the matter if contrary proof is available. For purposes of these motions, plaintiffs have made a sufficient showing to rebut defendants' prima facie case of ownership based upon defendants' status as registrants of the *Tetris* trademarks and copyrights.[8]

b. Registrations Will Not Trump Contractually Agreed Upon Ownership Rights

▬▬▬ Second, as a separate challenge to the statutory presumptions afforded registrations, plaintiffs correctly point out that the law will not permit these presumptions to supercede a contractual arrangement between the parties.[9] *See e.g., Estate of Hogarth*, 342 F.3d at 166–67. A licensee's right to use a licensor's intellectual property ceases when the license expires. *See e.g., Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228, 230 (2d Cir.1982) (Once the contract between licensor and licensee expired, the licensee was liable for copyright infringement); *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*, 654 F.Supp. 1095,

1100 (D.N.H.,1987) ("A licensee 'acquires only the right to use the trademark, while title to the mark and the reversionary interest in that use remains with the owner.'") (quoting L. Altman, 3 *Callman, The Law of Unfair Competition, Trademarks and Monopolies* §§ 19.46 at 200–01 (4th ed.1983)).

In *Major–Prodotti Dentari–Societa in Nome Collettivo Di Renaldo Giovanni & Figli v. Shimer*, 1968 WL 8340, 161 U.S.P.Q. 437, 438 (Trademark Tr. & App. Bd.1968), a foreign manufacturer granted a license to be the exclusive distributor of its product in the United States and the licensee in turn registered the product's trademark in his name. Addressing a dispute between the manufacturer and the distributor over the trademark rights, the Patent Office Trademark Trial and Appeal Board wrote that "the ownership of the mark ... is a matter of agreement between the parties ...." and that "it is clear that when the agreement expired, any rights which respondent may have had in the mark during the life of the agency immediately reverted to [the manufacturer]." *Id.* (citing *A Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923) and other cases); *see also Omag Optik Und Mechanik A.G. v. Weinstein*, 85 F.Supp. 631 (S.D.N.Y. 1949)(Where a distributor licensed the mark from its owner and manufacturer of the related goods, the distributor must demonstrate "a clear intention on the part of the manufacturer to transfer the mark to the distributor" before the distributor may lay claim to the benefits of the registration).

Accordingly, an ultimate determination that plaintiffs in this action had reversion-

---

8. The "incontestable" trademark is addressed *infra.*

9. Defendants vociferously claim that no contract exists that reserves these rights to Pajitnov. That fact is squarely in dispute and cannot be resolved at this stage.

ary property rights to *Tetris* pursuant to a contract with defendants would successfully rebut any evidence of ownership demonstrated by the registrations.

### c. The "Incontestable" Trademark Is Subject to Challenge

■ Third, defendants urge that one of their trademarks has obtained an "incontestable" status because they have used it in commerce for five continuous years subsequent to the date of registration. *See* 15 U.S.C. § 1065. While they do not contest that defendants have made this initial showing, plaintiffs contend that several affirmative defenses or exceptions defeat the purported incontestable status.[10] In particular, plaintiffs contend: (1) that defendants' inequitable conduct defeats the mark's incontestable status, (2) equitable estoppel must prevent defendants from even raising an incontestability claim, and (3) defendants committed fraud in obtaining the registration they allege is now incontestable and that conduct is an absolute defense. Any of the affirmative defenses, if established, would strip defendants of the conclusive presumption of ownership linked to an incontestable trademark and thus the registration would be only prima facie evidence of ownership. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 199 n. 6, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

### i. Plaintiffs May Be Able To Demonstrate Inequitable Conduct By Defendants And Thereby Defeat The Incontestable Status Of The Trademark

Section 1115(b)(9) provides that the status of "conclusive evidence" afforded an "incontestable" mark may be defeated if "equitable principles, including laches, estoppel, acquiescence, are applicable." Plaintiffs proffer that defendants' filing of the '499 Registration—the document registering the purported incontestable trademark—was a blatant example of inequitable conduct. Specifically, they contend that defendants filed the '499 Registration *after* the parties had—as plaintiffs describe—"effectively reached an interim settlement agreement [embodied by the TTC Agreement] regarding the disputed rights ... and without disclosing to Plaintiffs that [defendants were] doing so." (Pls' Mem. Opp. Prelim. Inj. ("Pls' Mem. Opp.") at 9–10). Moreover, according to plaintiffs, defendants never informed them "that there was a clock running on their ownership claims and that the interim resolution of the parties' dispute by creating TTC would be used against Plaintiffs to argue that ... Pajitnov's contractual rights purportedly expired because he had chosen not to litigate." (Pls' Mem. Opp. At 10). Plaintiffs essentially claim that defendants sang two different tunes—on the one hand engaging in an apparent good faith resolution, while on the other hand solidifying their own claim by registering the trademark in their name out of plaintiffs' earshot.

Defendants vehemently dispute plaintiffs' position that the TTC Agreement was "effectively an interim settlement." Ultimately though, just what impression and expectations defendants conveyed to plaintiffs is a factual issue that cannot be resolved at this stage of the litigation. *See e.g., Golden Budha Corp. v. Canadian Land Co. of America, N.V.*, 931 F.2d 196, 201 (2d Cir.1991) ("[I]t simply was improper to dispose of the equitable defenses ... when there remained a factual issue as to just how long the critical information had

---

**10.** "The words 'incontestable' and 'exclusive' sound more impressive than the legal rights that the Lanham Act actually conveys, howev-

er." *Eco Mfg. LLC. v. Honeywell Intern., Inc.*, 357 F.3d 649, 651 (7th Cir.2003).

been concealed from the appellant and its assignor."). Accordingly, neither party has demonstrated a likelihood of success in this regard; therefore, an equitable defense to defendants' incontestable claim will be able to be raised at trial and defendants are not entitled to a preliminary injunction as to their alleged incontestable registration.

**ii. Plaintiffs May Be Able to Prove the Elements of Equitable Estoppel, Thereby Barring Defendants From Raising The Alleged Incontestability Of The '499 Registration**

 Equitable estoppel requires a showing of (1) a material misrepresentation, (2) reasonable reliance upon that representation, and (3) damage and is a defense to an alleged incontestable registration. *See* 15 U.S.C. § 1115(b)(9); *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993). Plaintiffs allege that Pajitnov was instructed by an attorney for CCAS to sign the confirmations and they were "merely a confirmation of the then-current status of the rights to *Tetris*" which Pajitnov understood to be that he had granted his rights for a ten-year period. (Pajitnov Decl. ¶ 15). Whether defendants indeed misrepresented the purpose of the confirmations, or whether they omitted to inform Pajitnov that they would seek incontestable status for the *Tetris* trademarks, and whether any reliance upon any misrepresentation was reasonable and caused plaintiffs damage are questions of fact that cannot be decided on these motions. Because neither side has demonstrated a likelihood of success on the merits as to equitable estoppel, an equitable defense to defendants' incontestable claim cannot be foreclosed to plaintiffs at this point and defendants' are not entitled to a preliminary injunction as to their alleged incontestable registration.[11]

**iii. Plaintiffs May Be Able To Show That Defendants Obtained The Alleged Incontestable Registration By Fraud, Thereby Defeating Its Incontestable Status**

Plaintiffs assert that defendants committed acts of fraud on the U.S.P.T.O. in obtaining the '499 Registration, thereby defeating its incontestable status. In particular, plaintiffs allege that at the time Soviet Elorg filed the '499 Registration, it knew that it was not the owner, but merely a licensee, all the while allowing Pajitnov to believe that neither that registration nor any other documents he signed would be used in any way to affect his rights after the ten-year limit. Belikov—plaintiffs claim—submitted false "assignments" of the trademark on behalf of entities which Belikov now states either no longer existed or had no rights to assign at the time of execution.

Again, these allegations present factual issues that cannot be decided at this stage of the litigation. Those claims do preclude defendants now from demonstrating a likelihood of success on the merits as to the incontestable mark and accordingly, they are not entitled to a preliminary injunction as to their alleged incontestable registration.

**D. Plaintiffs' Claims Are Not Barred As A Matter Of Law**

Defendants assert that plaintiffs' challenges to their motion for preliminary re-

11. Though not cited by the parties, a related doctrine exists called "licensee estoppel"—" 'an equitable doctrine' under which '[a] licensee who has used a designation under a license from another is ordinarily estopped from asserting ownership of the designation as against the licensor.' " *Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.* 43 Fed.Appx. 408, 414, 2002 WL 1467852 (2d Cir.2002)(quoting Restatement (Third) Unfair Competition, § 33, cmt. d (1995)).

lief are legally barred. First, defendants contend that plaintiffs are estopped from now challenging defendants' ownership claims by virtue of plaintiffs having acquiesced to defendants' asserted rights. Second, according to defendants, various statutes of limitations now bar plaintiffs from presenting certain of their challenges.

**1. Plaintiffs Have Not As A Matter Of Law Acquiesced To Defendants' Asserted Ownership Claims**

Defendants claim that plaintiffs have acquiesced to their asserted ownership rights because Pajitnov and Rogers both have stated that the dispute as to ownership arose as early as 1995 or 1996. At that time, all the trademark registrations were in Elorg's name, yet according to defendants, plaintiffs made no challenge to defendants' asserted ownership. (Pajitnov Decl. ¶¶ 18–19; Rogers Decl. ¶ 9).

■ The U.S. Court of Appeals for the Second Circuit has "long held in the context of trademark actions that '[w]here a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer ..., or acquiesces in the latter's use, ... a court of equity has the discretionary power ... to deny injunctive relief ....' " *ProFitness Physical Therapy Center v. Pro–Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir.2002) (quoting *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 703 (2d Cir.1970)). The defense of acquiescence has three elements: " '(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice.' " *Id.* (quoting *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir.2002)).

■ Plaintiffs contend that their failure to bring suit earlier was reasonable in light of their view of having reached an interim settlement. Because defendants have not demonstrated that plaintiffs' actions meet the standard as a matter of law, the defense of acquiescence will require as to each element findings of fact that are inappropriate for resolution at this stage of the litigation.

**2. Plaintiffs Are Not Barred As A Matter Of Law By The Applicable Statutes Of Limitations**

In addition to the defense of acquiescence, defendants assert that statutes of limitations bar plaintiffs from challenging defendants' ownership claims.

**a. Plaintiffs May Still Seek Declaration Of Their Sole Ownership**

■ Defendants claim that plaintiffs' ownership claim as to the *Tetris* copyrights are time barred. *See* 17 U.S.C. § 507 ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."). "Copyright claims begin to accrue when the plaintiff 'knows or has reason to know of the injury upon which the claim is premised.' " *Barksdale v. Robinson*, 211 F.R.D. 240, 244 (S.D.N.Y.,2002) (quoting *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir.1996)). A party's express assertion of sole ownership will begin the clock running. *Id.*

However, plaintiffs note that they do not bring a copyright infringement claim pursuant to Title 17 and thus correctly state that the statute of limitations set forth in 17 U.S.C. § 507 is inapplicable to this action; thus, defendants have not shown a likelihood of success on this point.

**b. Plaintiffs May Allege Defendants' Fraud As A Defense To The Alleged Incontestable Registration**

■ Defendants assert that plaintiffs are time barred from asserting fraud as a

defense to defendants' purported incontestable trademark because plaintiffs discovered the fraud long ago. However, plaintiffs respond that none of these claims accrued until defendants claimed for the first time in 2003 in letters to current *Tetris* licensees that their trademark registration trumped any contractual arrangement between the parties and when Belikov filed his declaration. The interpretation of the facts by plaintiffs is plausible and, as stated above, places the issue of fraud—and its discovery—squarely in dispute. As such, plaintiffs may be able to demonstrate their lack of knowledge through 2003 as to defendants' alleged fraud, and thus, defendants have not shown a likelihood of success as to this issue.

### c. Defendants May Be Equitably Barred From Asserting A Statute Of Limitations Defense

Plaintiffs appear to argue that because defendants lulled them into believing that the matter could be resolved without court intervention and that litigation within the relevant limitations period was unnecessary, defendants should be equitably estopped from asserting a statute of limitation defense. *See Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 50 (2d Cir.1985). In response, defendants again vigorously oppose the notion that the TTC Agreement was any sort of settlement between the parties. Once again, these issues of fact cannot be resolved in the context of these motions.

### IV. Defendants Have Set Forth Sufficient Evidence to Demonstrate Their Relationship to Their Alleged Predecessors

As set forth in this Court's Opinion and Order dated August 25, 2004 granting the motion to disqualify plaintiffs' counsel in this action, "defendants have provided the more credible facts and representations that Elorg USA is the successor in interest to V/O, at least for purposes of this motion to disqualify counsel." That holds true for these motions as well. In addition, that same body of evidence demonstrates that Elorg USA is likely the assignee of the *Tetris* rights. Accordingly, defendants have shown a likelihood of success as to this issue and this challenge by plaintiffs will not bar defendants from preliminary relief that this Court has otherwise deemed proper.

### V. There Are Sufficiently Serious Questions Going To The Merits Of This Case, But Neither Side Has Demonstrated That The Balance Of Hardships Tips Decidedly In Its Favor

Each side asserts that the balance of hardships tips decidedly in its favor. Each side has been enduring hardships, yet neither decidedly more severe than its opponent, and the balance of hardships does not tip decidedly in either direction.

### VI. Conclusion

For the reasons set forth above, the motions for preliminary injunctions are denied, except insofar as defendants' motion is granted as to the merchandising rights to *Tetris*. Accordingly, plaintiffs are hereby preliminarily enjoined from interfering with defendants' enjoyment of the *Tetris* merchandising rights in a manner inconsistent with this Opinion and Order.